Eastern District of Kentucky
FILED

JUN 1 2 2026

AT FRANKFORT
Robert R. Carr
CLERK U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## FRANKFORT DIVISION

| | | |
|---|---|---|
| GLASS, LEWIS & CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 3:26-CV-46-KKC |
| | ) | |
| RUSSELL COLEMAN, *in his official* | ) | |
| *capacity as Attorney General of Kentucky,* | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Glass, Lewis & Co., LLC ("Glass Lewis") brings this Complaint for declaratory and injunctive relief against Russell Coleman, in his official capacity as Attorney General of Kentucky, to challenge a newly enacted Kentucky statute, S.B. 183 (the "Act") (attached as Ex. 1).

Glass Lewis respectfully requests a decision on its forthcoming motion for a preliminary injunction in advance of the Act's effective date of July 15, 2026.

## INTRODUCTION

1.     S.B. 183 is clearly unconstitutional. It violates the First Amendment's core prohibition on viewpoint discrimination. The Act targets proxy advisory firms like Glass Lewis, which institutional investors hire to provide research and recommendations on how to vote their shares at shareholder meetings. When Glass Lewis' speech reflects certain viewpoints disfavored by the government, the Act compels Glass Lewis to broadcast the government's contrary viewpoint and publicly condemn itself. For example, the Act imposes *significant burdens* for saying "the company's board is wrong" and *no burdens* for saying "the company's board is right." Thus, S.B. 183 blatantly discriminates based on viewpoint in violation of the First Amendment.

2.     If Glass Lewis disagrees with a company's board, but declines to provide government-mandated analysis, Glass Lewis must tell its own clients, who are shareholders, that Glass Lewis' "advice *subordinates the financial interests of shareholders* to other objectives, including *sacrificing investment returns* or undertaking additional investment risk[.]"

3.     S.B. 183 exists to do what the First Amendment strictly forbids: "tilt public debate in a preferred direction." *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011). "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741-42 (2024). A state "cannot advance some points of view by burdening the expression of others. To give government that power is to enable it to control the expression of ideas, promoting those it favors and suppressing those it does not. And that is what the First Amendment protects all of us from." *Id.* at 744 (citations omitted). The Act's egregious viewpoint discrimination is dispositive and fatal under the First Amendment.

4.     The Act's legislative sponsor, Senator Nunn, openly admitted that the purpose of the Act is the suppression of speech: "First, it's meant to *prevent proxy voting recommendations* from being made based on non-financial agendas, for example, social, political, or ideological interest." Proxy voting recommendations are speech, and the Act is "meant to prevent" that speech when it involves social, political, or ideological interests.

5.     While Glass Lewis disagrees with this characterization of its speech, the Legislature's *goal* of preventing "social, political, or ideological" speech offends the very core of

the First Amendment: "Speech on matters of public concern is at the heart of the First Amendment's protection. . . . Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection. . . . Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 451-53 (2011) (cleaned up).

6. Senator Nunn did not stop there: "Second, [the Act is] meant to *prevent* situations where a *proxy advisor pushes shareholders to support a shareholder proposal* against the recommendation of the company's independent board . . . ." Although Glass Lewis does not "push" shareholders, a proxy advisor could only "push shareholders to support" a proposal through speech—speech that the Act is "meant to prevent." Senator Nunn has one more speech-suppression goal for the Act: "And third, it's aimed at *preventing inconsistent guidance* where a proxy advisor provides materially different advice[.]" Proxy advisors provide their advice and guidance through speech, and the Act is "aimed at preventing" speech. Quite simply, the Act's purpose is openly and directly related "to the suppression of free expression," so "the government may not pursue it consistent with the First Amendment." *Moody*, 603 U.S. at 742.

7. In addition to violating the First Amendment, the Act is unconstitutionally vague, chilling Glass Lewis' speech by defining the Act's requirements with intensely politicized, novel, and unexplained terms that have no agreed meanings.

8. Additionally, the Act violates the Dormant Commerce Clause.

9. The Act is also expressly preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), which instructs Glass Lewis' clients—the fiduciaries who invest for employee benefit plans—to consider all relevant facts.

10. For these reasons and those detailed below, Glass Lewis seeks declaratory and injunctive relief barring the Attorney General's enforcement of S.B. 183 against Glass Lewis.

## PARTIES

11. Plaintiff Glass, Lewis & Co., LLC is a Delaware limited liability company with its principal place of business in San Francisco County, California. Glass Lewis supplies proxy voting advice and other forms of investment advice to institutional investors, including clients in Kentucky.

12. Defendant Russell Coleman is the Attorney General of Kentucky and is responsible for enforcing S.B. 183. *See* S.B. 183 § 3; Ky. Rev. Stat. § 367.990. He is sued in his official capacity. Defendant Coleman maintains an office at 1024 Capital Center Drive, Suite 200, Frankfort, KY 40601.

## JURISDICTION AND VENUE

13. This action arises under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. §§ 2201-02, and the U.S. Constitution. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because the Attorney General resides in this District for purposes of official-capacity suits and a substantial part of the events giving rise to the claims occurred in this District.

## BACKGROUND

### I.    Kentucky S.B. 183

15. Independent proxy advisors like Glass Lewis have become a focal point of a politically motivated campaign to suppress certain factors from being considered in investment and shareholder voting decisions. The Attorney General's Office has been involved in these efforts, joining state Attorneys General in demand letters to Glass Lewis and another proxy

advisory service, Institutional Shareholder Services Inc. ("ISS"), accusing them of violating state consumer-protection laws based on the content of their proxy advice, and characterizing investment approaches the Attorney General's Office disfavors as a "trend" to use "other people's money" "to push [] political agendas and force social change."[1] President Trump has also singled out proxy advisory firms, issuing an executive order that targets them for supposedly advancing "politically-motivated agendas." Exec. Order No. 14,366, Protecting American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors, 90 Fed. Reg. 58,503 (Dec. 11, 2025). The Act was crafted specifically to target "two firms in particular": Glass Lewis and ISS.

16.    S.B. 183 was enacted over Governor Beshear's veto. Governor Beshear objected that S.B. 183 "infringes on the[] First Amendment rights" of faith-based organizations.[2] The General Assembly overrode the veto a few days later.

17.    In 2025, Texas enacted a near-identical law, and its enforcement was preliminarily enjoined before it took effect. *See* Text Order dated Aug. 29, 2025, *Glass, Lewis & Co., LLC v. Paxton*, No. 1:25-cv-1153 (W.D. Tex. Aug. 29, 2025); Tex. Bus. Org. Code ch. 6A. Several other states have moved to enact copycat legislation apparently modeled on a template distributed by an organization called "Consumers Defense," whose stated "mission" is to "protect[] Americans from the scourge of ESG in all its forms, in every state, and in every arena where it infects."[3]

18.    Kentucky's S.B. 183 is a product of this coordinated campaign. The Act, nearly identical to the Texas law, also closely mirrors the Consumers Defense model legislation. S.B. 183

---

[1] Commonwealth of Kentucky, Office of the Attorney General, Opinion No. 22-05 (May 26, 2022), https://perma.cc/E56N-YLK9.

[2] Office of the Governor, Veto Message Regarding Senate Bill 183 of the 2026 Regular Session (Mar. 27, 2026), https://apps.legislature.ky.gov/record/26rs/sb183/veto.pdf.

[3] Consumers Defense, https://perma.cc/7VBH-TL88; Proxy Advisor Transparency Act, Consumers Defense, https://perma.cc/A2S8-H7NH.

imposes a punitive compelled-speech regime on any proxy advisor that recommends against a management-backed proposal. Noncompliance is treated as a deceptive trade practice, exposing Glass Lewis to enforcement actions and civil penalties for its speech expressing opinions disfavored by the government.

19.    At a high level, the Act compels proxy advisors to "conspicuously" disparage themselves with government-mandated statements whenever: (1) their advice goes against a company's board; or (2) the proxy advisors' speech takes into account so-called "nonpecuniary interests" including but not limited to "an environmental, social, political, or ideological interest." S.B. 183 §§ 1, 2. Moreover, whenever a proxy advisor gives "different advice to different clients," it must also state that one particular view is correct—the proxy advisor must "disclose the advice or recommendation that is . . . solely in the interest of shareholders" and "[s]upported by an economic analysis performed and relied upon by the proxy advisor." *Id.* § 2(3). It must give this compelled statement to shareholders, the company that is subject to the advice, and the Attorney General.

20.    S.B. 183 tasks the Attorney General (among others) with enforcing the Act. *Id.* § 3.

21.    The Act has a broad scope. It covers "proxy advisors," but defines that term to cover "any person who is engaged in the business of providing advice, research, analysis, ratings, or recommendations specifically with respect to proxy voting for compensation." *Id.* § 1(9). It defines "proxy advisory service" as:

> (1) "[a]dvice or a recommendation on how to vote on a shareholder-sponsored proposal or company proposal";
>
> (2) "[p]roxy statement research and analysis regarding a shareholder-sponsored proposal or company proposal";
>
> (3) "[a] rating or research regarding corporate governance"; or

(4) "[d]evelopment of proxy voting recommendations or policies, including establishing default recommendations or policies."

*Id.* § 1(10).

22.    The Act defines "company" as "a publicly traded for-profit corporation, limited liability company, partnership, or other business entity that is doing business in this state as defined in KRS 141.010(13)." *Id.* § 1(1). Kentucky Revised Statutes § 141.010(13) defines "doing business in this state" to include:

(a) Being organized under the laws of this state;

(b) Having a commercial domicile in this state;

(c) Owning or leasing property in this state;

(d) Having one (1) or more individuals performing services in this state;

(e) Maintaining an interest in a pass-through entity doing business in this state;

(f) Deriving income from or attributable to sources within this state, including deriving income directly or indirectly from a trust doing business in this state, or deriving income directly or indirectly from a single-member limited liability company that is doing business in this state and is disregarded as an entity separate from its single member for federal income tax purposes; or

(g) Directing activities at Kentucky customers for the purpose of selling them goods or services.

23.    So, the set of entities within the scope of "company"—including any entity with one person performing services in Kentucky—is extremely broad and impossible for Glass Lewis to know comprehensively.

7

24.   S.B. 183 can be broken into three operative provisions:

(1) Section 2(2), which compels proxy advisors to publicly disparage themselves with government-mandated statements when their proxy advice is deemed to be "not solely in the interest of shareholders" because it (1) takes into account any "nonpecuniary interests," (2) goes against the company's board and does not include a "written economic analysis," or (3) "[a]dvises against a company proposal to elect a governing person" without stating that the service is given "solely in the interest of the shareholders";

(2) Section 2(3), which compels proxy advisors to publicly disparage themselves with government-mandated statements when they provide different advice to different clients who have not expressly requested services "for a nonpecuniary interest"; and

(3) Section 3, which authorizes enforcement by the Attorney General and private parties.

25.   **Section 2(1)** provides that proxy advisors' advice is "not solely in the interest of shareholders of a company if the service":

(a) Is wholly or partly based on, or otherwise takes into account, one (1) or more nonpecuniary interests or subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote or further nonpecuniary interests;

(b) involves providing a voting recommendation with respect to a shareholder-sponsored proposal that:

1. Is inconsistent with the voting recommendation of the company's board of directors or a board committee composed of a majority of the company's independent directors; and

2. Does not include a written economic analysis of the financial impact on shareholders of the proposal; or

(c) Advises against a company proposal to elect a governing person unless the proxy advisor affirmatively states that the proxy advisory service rendered such advice solely in the interest of the shareholders of the company.

*Id.* § 2(1). "Nonpecuniary interest" is defined to include, but is not limited to, "an environmental, social, political, or ideological interest which does not have a direct and material connection to the financial risk or financial return of an investment." *Id.* § 1(7). These bespoke definitions of services

"not solely in the interest of shareholders" and "nonpecuniary interest" are broad, vague, and at odds with ordinary meaning.

26.    Under **Section 2(2)**, the proxy advisor must provide self-denigrating statements to its clients and the subject company any time Section 2(1) is triggered. When Section 2(1) is triggered, Section 2(2) requires a proxy advisor to:

(a) Include, in writing or by electronic means, a disclosure to each shareholder or entity or other person acting on behalf of a shareholder receiving the proxy advisory service that:

1. Conspicuously states that pursuant to subsection (1) of this section the proxy advisory service is not being provided solely in the interest of shareholders and that the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote one (1) or more nonpecuniary interests; and

2. Explains, with particularity, the basis of the proxy advisor's advice concerning each recommendation, including but not limited to the company or companies for which the advice applies to and the nonpecuniary interests used in the basis of the advice; and

(b) immediately provide a copy of the disclosure required under paragraph (a) of this subsection to the company that is subject to the proxy advisory service.

27.    **Section 2(3)** compels disparaging statements when a proxy advisor provides different voting advice to different clients (even though they may be differently situated or have different investing approaches). *Id.* § 2(3). It applies where a proxy advisor provides "materially different" advice, as defined by the Act. The Act defines advice as "materially different" if the proxy advisor is "simultaneously advising or recommending that one (1) or more clients vote for:"

(a) The proposal and one (1) or more clients vote against the proposal;

(b) A nominee for a company's governing authority and one (1) or more clients vote against or abstain from voting for the same nominee; or

(c) Or [sic] against the proposal in opposition to the recommendation of the company's management.

*Id.* § 1(6).

9

28.    **Section 2(3)** compels disparaging statements when proxy advisors give such advice. "If the proxy advisor provides materially different advice to different clients who have not expressly requested proxy advisory services for a nonpecuniary interest," the advisor shall:

> (a) If applicable, comply with the disclosure requirements in subsections (1) and (2) of this section; and
>
> (b) Notify, in writing or by electronic means, each shareholder or entity or other person acting on behalf of a shareholder receiving the proxy advisory service, the company that is subject to the materially different advice provided by the proxy advisory service, and the Attorney General, of the materially different advice and disclose the advice or recommendation that is:
>
> > 1. Provided solely in the interest of shareholders; and
> >
> > 2. Supported by an economic analysis performed and relied upon by the proxy advisor.

*Id.* § 2(3).

29.    Finally, Section 3 provides for enforcement.

30.    **Section 3(1)** states that "[f]ailure to comply with the notification and disclosure requirements established for proxy advisors in Sections 1 and 2 of this Act shall be deemed to be an unfair, false, misleading, or deceptive act or practice in the conduct of trade or commerce in violation of KRS 367.170." *Id.* § 3(1).

31.    **Section 3(2)** allows for a suit for declaratory and injunctive relief by "[t]he recipient of proxy advisory services provided by a proxy advisor, the company that is the subject of the proxy advisory services, or any shareholder of the company that is the subject of the proxy advisory services." In addition, private plaintiffs must "serve the Attorney General with a copy of the petition" and the "Attorney General may intervene in the action." *Id.* § 2(3).

32.    **Section 3(3)** provides that "[a]ll of the remedies, powers, and duties provided to the Attorney General under KRS 367.110 to 367.300, and the penalties provided in KRS 367.990, pertaining to acts and practices declared unlawful by KRS 367.170, shall apply with equal force

10

and effect to a violation of Section 1 or 2 of this Act." The penalties provided in § 367.990 include civil penalties of $25,000 per violation of an injunction issued under § 367.190, and $2,000 per violation of the Consumer Protection Act if the violation is willful. Ky. Rev. Stat. § 367.990.

## II.   Glass Lewis

### A.   Overview of Proxy Advisors and Glass Lewis

33.   Public companies are required to hold annual and special meetings to conduct business that requires shareholder approval. At these meetings, shareholders vote on various matters, including board elections, proposals submitted by the board or by shareholders, and any other decisions for which federal or state law, exchange listing standards, or a corporation's charter or bylaws require a shareholder vote.

34.   Matters requiring shareholder votes are compiled into the company's "proxy statement," which contains information about the matters to be considered at the meeting and is distributed to shareholders in advance. At the meeting, shareholders, or more typically their proxies—the specified designees who vote the shares owned by particular stockholders—will vote.

35.   The issues put to a shareholder vote range in complexity—including everything from ratifying the choice of an auditor, electing the board of directors, approving company plans to issue new shares (or rights to acquire new shares) as part of an executive and/or employee compensation program ("equity plans"), or approving proposed mergers and acquisitions.

36.   Proposals put forth by shareholders may cover a range of topics, including issues of corporate governance, executive compensation, as well as risks to the company stemming from environmental and social factors. Shareholder proposals are an important component of shareholder democracy. As the SEC has explained, shareholder proposals "provide an important mechanism for investors to express their views, provide feedback to companies, exercise oversight of management, and raise important issues for the consideration of their fellow shareholders."

11

SEC, Substantial Implementation, Duplication, and Resubmission of Shareholder Proposals Under Exchange Act Rule 14a-8, 87 Fed. Reg. 45,052, 45,053 (July 27, 2022).

37.    Company management (officers and the board of directors) often weigh in on shareholder proposals. *See* 17 C.F.R. § 240.14a-8(m)(1). The SEC describes this option as allowing management "to make arguments reflecting its own point of view, just as [shareholders] may express [their] own point of view." *Id.*

38.    There are many areas where management's interests may diverge from shareholders' interests, such as executive compensation, short-term performance vs. long-term growth, and management insulation from shareholder accountability. This idea—that management's interests may diverge from those of shareholders—is a fundamental and long-standing tenet of corporate law. *See* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976). For example, although shareholder proposals are almost always opposed by company management, academic research "has shown that these proposals have been 'key drivers' of governance changes such as the destaggering of board elections to increase corporate boards' accountability to shareholders."[4]

39.    Glass Lewis is a proxy advisory firm. It provides institutional investors with independent research, data analytics, and voting recommendations, so that those investors can discharge their fiduciary duty to cast informed votes on company ballot items. Through its proxy voting solutions and independent analysis, Glass Lewis aims to support the creation and preservation of long-term shareholder value.

---

[4] Colleen Honigsberg and Robert Jackson, *Exxon's Suit Against Its Own Shareholders Threatens Valuable Bargaining*, ProMarket (July 16, 2024), https://perma.cc/FRE3-KHR5.

40.    Glass Lewis engages in First Amendment protected speech and expression when it provides advice and recommendations on how to vote on management and shareholder proposals, distributes proxy statement research, and develops proxy voting recommendations and policies. These services are at the core of Glass Lewis' business and constitute pure speech: written reports and policies that reflect Glass Lewis' views on how to best serve its clients and create and preserve long-term shareholder value.

41.    Glass Lewis' proxy vote recommendations are statements of opinion. For decades, the SEC has recognized the subjective nature of proxy advice and other speech on shareholder votes: "commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint." SEC, Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992). The SEC "recognize[s] that the formulation of proxy voting advice often requires subjective determinations and the exercise of professional judgment[.]" SEC, Proxy Voting Advice, 87 Fed. Reg. 43,168, 43,181 (July 19, 2022). Glass Lewis' reports contain the following disclaimer: "Glass Lewis' proxy vote recommendations are solely statements of opinion, and not statements of fact, on matters that are, by their nature, judgmental."

42.    Glass Lewis regularly advises that shareholders vote against the recommendation of company management when Glass Lewis believes doing so is in the best interests of shareholders. Votes against company management can help ensure accountability to shareholders.

43.    Recommendations for or against company management reflect Glass Lewis' opinions on the company and the proposals at issue. For example, Glass Lewis may make a recommendation that goes against company management's views if Glass Lewis believes greater

transparency is needed, shareholder interests are being discounted, or the proposal would lead to fewer checks on management. In cases of poor financial performance or problematic governance practices, Glass Lewis may also take the position that board members should be changed or that the company's performance does not warrant a substantial increase in compensation. Again, these opinions reflect Glass Lewis' viewpoints about the company, its performance, and which corporate governance methods most effectively serve the interests of Glass Lewis' clients.

44. Glass Lewis falls under the Act's definition of "proxy advisor." S.B. 183 § 1(9). Its speech qualifies as "proxy advisory service[s]" as defined by S.B. 183 § 1(10): Glass Lewis (1) provides advice and recommendations on how to vote on company and shareholder-sponsored proposals; (2) gives proxy statement research and analysis regarding company and shareholder-sponsored proposals; (3) develops proxy voting recommendations or policies; and (4) provides research regarding corporate governance. *Id.*

45. Glass Lewis' clients include some of the world's largest public pension plans, mutual funds, and asset managers. Glass Lewis exclusively serves highly sophisticated institutional investors. Glass Lewis does not serve retail investors.

46. Glass Lewis serves at least eight clients with a Kentucky mailing address.

47. Glass Lewis is not aware of any Kentucky clients who have requested that Glass Lewis provide what S.B. 183 refers to as an "economic analysis."

48. Glass Lewis also provides reports and recommendations on companies with headquarters in Kentucky—including Humana Inc., Yum! Brands, Inc., and Brown-Forman Corporation, among many others.

49. Glass Lewis is independent of the companies about which it advises. It has no stake in the outcome of any shareholder vote, does not seek to control or influence any corporation, and

14

does not engage in solicitation activities for or against any ballot measure. Glass Lewis' role is solely to provide research and analysis that helps its clients form their own views on the proposals on which they are entitled to vote.

50.    Glass Lewis is organized in Delaware, and its principal place of business is in California.

51.    Glass Lewis regularly provides advice and recommendations for Kentucky clients and about Kentucky companies that go against company management. To continue to serve its clients, Glass Lewis will be providing this same speech after the Act's effective date of July 15, 2026.

**B.    Glass Lewis' Proxy Papers**

52.    A core function of Glass Lewis' business is to provide proxy advice—reports with research and recommendations on how to vote on upcoming shareholder meetings and proposals ("Proxy Papers").

53.    Glass Lewis' Proxy Papers reflect the company's views and beliefs about what may be in the best interests of its clients based on established corporate governance best practices. They reflect the opinions of the company and its analysts. When Glass Lewis recommends a vote, it does so because Glass Lewis views that specific voting position as in the best interests of its clients.

54.    Glass Lewis is paid prior to the delivery of its Proxy Papers. It is not compensated based on whether it recommends for or against a proposal. Its Proxy Papers are designed to inform institutional investors and reflect Glass Lewis' views about the best interests of its clients; they are not used to advertise Glass Lewis' services.

55.    Glass Lewis' Proxy Papers contain detailed explanations of the facts relied upon, the policy provisions applied, and the reasoning behind the recommendations. The full Proxy Paper is shared with clients via Glass Lewis' research and voting platforms together with the

15

corresponding voting recommendations, enabling clients to fully evaluate and question the recommendations as they see fit prior to making their final voting decisions.

56.    Glass Lewis' Proxy Paper on a company's annual meeting often consists of 50 or more pages of financial analysis, including dense tables of quantitative and qualitative information. Not only does Glass Lewis provide multi-year data on total shareholder returns relative to a company's index and peers, the section on the Advisory Vote on Executive Compensation alone for large companies often includes multiple tables of quantitative data and graphical representation of the company's executive compensation against its peer group, performance comparisons on earnings per share (EPS), return on equity (ROE), and returns on assets (ROA) against peers, and well over 100 financial data points. Further, each Proxy Paper provides company financial performance relative to peers across a multitude of financial measures of economic performance, including, but not limited to: gross profit margin, operating and net income margins, price/earnings ratios, total enterprise value to revenue and EBIT, and five-year revenue growth rate and earnings per share.

57.    As a matter of practice, Glass Lewis publishes its reports in the United States an average of 21 days prior to the company's annual meeting. This allows time for clients to consider Glass Lewis' recommendations, discuss them internally along with other information the client may consider, engage with the company, if necessary, and decide how to vote. Glass Lewis also allows companies to respond to its reports within this window. Glass Lewis may then issue a supplemental or amended report based on the company's feedback.

58.    Glass Lewis will only submit votes for a client if that client separately and expressly asks it to do so, pursuant to the client's chosen voting policy, for types of votes chosen by the client, and on timing specified by the client.

16

### C.    Benchmark, custom, and thematic voting policies

59.    Glass Lewis' recommendations are tailored to each client's specific voting policy.

60.    Glass Lewis offers a Benchmark Policy that clients may choose, which reflects Glass Lewis' views as supported by two decades of Glass Lewis' research and analysis on how clients wish to create and preserve shareholder value. This includes recommendations against the views of company management when Glass Lewis believes they would not be in the best interests of shareholders.

61.    While Glass Lewis offers a Benchmark Policy, the significant majority of Glass Lewis' clients choose policies tailored to their specific investment preferences. Each Glass Lewis client has unique investment approaches, risk tolerances, views, and needs. For that reason, Glass Lewis offers its clients a menu of options. Indeed, Glass Lewis has announced that, by the end of 2027, it will move all clients off its Benchmark Policy and instead require them to receive recommendations under a custom or thematic policy chosen by that client. Glass Lewis also intends to offer multiple perspectives in its reports to better reflect the diverse views of its clients on proxy voting issues.

62.    Customization "empowers investors to express their unique ideologies and allocate their attention more efficiently, leading to potentially more informed voting that accurately reflects institutional investors' preferences."[5] The creation of a custom policy involves extensive discussions with and explicit confirmation upon implementation from the client.

63.    Custom policies allow Glass Lewis to focus its attention on issues that are important to investor clients to better inform them about upcoming votes and ensure that the

---

[5] Edwin Hu, et al., *Custom Proxy Voting Advice*, Harv. L. Sch. F. on Corp. Governance (May 23, 2024), available at https://perma.cc/QB3R-4RF5.

17

recommendations for those items are aligned with their guidelines. Custom voting policies are now a standard practice among institutional investors.

64.     Glass Lewis also offers thematic voting policies. For example, Glass Lewis has developed a Catholic Policy that reflects the unique fiduciary responsibility of Catholic institutions and that is informed by the voting guidelines of the Conference of Catholic Bishops. It has a Climate Policy for investors focused on mitigating risks associated with climate change. And it has a Corporate Governance Focused policy that provides recommendations that focus on the most commonly accepted components of corporate governance, while generally recommending in line with management on environmental and social issues.

65.     Because different clients adopt different policies, it is common—and entirely expected and appropriate—for Glass Lewis to provide differing recommendations on the same ballot item to different clients. That variability simply reflects differences among clients' own stated preferences and fiduciary objectives.

66.     These recommendations can vary based on factors that likely do not qualify as "nonpecuniary" under the Act. For example, Glass Lewis may appropriately recommend voting "FOR" a proposal to investors with certain investment strategies and voting policies, but "AGAINST" the same proposal to investors with different strategies and voting policies. These differences reflect the reality that clients can seek to maximize shareholders' financial interests with different strategies and perspectives.

## III.     The Consequences of S.B. 183

67.     Absent an injunction, Glass Lewis may be required to prepare and deliver separate notices for essentially every recommendation it makes because its research addresses factors deemed "nonpecuniary" by S.B. 183.

68. Glass Lewis will be required to send statements immediately to the companies that are the subject of its advice whenever its tailored recommendations differ across clients. This will be a routine occurrence because of the variance in client preferences, policy choices, and customization.

69. S.B. 183 will also impose significant compliance costs by forcing Glass Lewis to prepare detailed statements for effectively every company meeting covered by S.B. 183. At minimum, making these statements will cost Glass Lewis hundreds of thousands of dollars in annual compliance costs. Glass Lewis will need to hire several additional analysts to monitor whether statements or written economic analyses are needed. And it will need to hire compliance officers and other personnel to ensure these statements and reports are properly provided to all required recipients under the law. And those costs are separate from the substantial risk of litigation. This will be especially chilling because S.B. 183 does not specify what constitutes a "violation" of the Act, allows for huge numbers of uninjured parties to bring suit (all shareholders of any company being discussed), and allows the Attorney General to bring enforcement actions *and* intervene in private actions.

70. Glass Lewis will likely lose clients if the firm routinely sends clients notices that it is not acting in shareholders' interest. Glass Lewis will suffer reputational harm by being forced to tell clients that it is endorsing proposals against the interests that those clients want to, or may be required to, advance. Glass Lewis will also suffer harm to its reputation and credibility by endorsing policies like corporate governance only to then be forced by the government to tell clients that such policies are against their interests.

71. Glass Lewis expects that many clients could misinterpret S.B. 183's required warnings. Because Glass Lewis must say that its advice "subordinates the financial interests of

shareholders," clients may be wrongly led to believe that a vote the other way will result in greater financial returns. As a result, clients may risk not voting or delaying their votes due to internal approvals, which would ultimately harm the company.

72. The "written economic analysis" under Section 2(1)(b) requires extensive detail and would force Glass Lewis to undertake substantial economic analyses, in addition to its existing voting-recommendation analysis. Upon information and belief, no other proxy advisor, board of directors, or other market participant currently engages in the sort of economic analysis called for by S.B. 183. That analysis would entail significant additional cost for Glass Lewis, above and beyond the hundreds of thousands of dollars in annual compliance costs.

73. Glass Lewis' Proxy Papers and client voting policies may be confidential. If Glass Lewis is required to state when and to whom it has recommended differing positions, it will necessarily have to violate the confidentiality of its recommendations and custom-voting policies.

74. Many Glass Lewis clients are asset managers to employee retirement plans governed by ERISA. If Glass Lewis were forced to label its tailored recommendations "nonpecuniary" and to send those misleading labels to issuers and regulators, certain clients could feel compelled to disengage from Glass Lewis' services rather than risk being wrongly portrayed as violating their own fiduciary duties under ERISA.

75. Without a preliminary and ultimately permanent injunction, Glass Lewis faces irreparable harm. The Act requires it to distort its speech and serve as a mouthpiece for the government's viewpoint. Glass Lewis would also incur substantial unrecoverable costs and sustain reputational damage.

76. The threat posed by enforcement of the Act by the Attorney General is substantial. While Glass Lewis has no way of knowing how many companies are covered by the Act, in 2025

it provided approximately 31,000 reports on shareholder meetings, a significant number of which involved companies that likely have advertised to or derived income from Kentucky. *See* S.B. 183 § 1; Ky. Rev. Stat. § 141.010(13) (defining covered entities to include any company that advertises to or derives any income from Kentucky). If each report to each client were to qualify as a violation carrying with it a $2,000 penalty, the threatened penalties for the next few months alone would likely total in the tens of millions.

### STANDING AND SOVEREIGN IMMUNITY

77.    Glass Lewis has standing to bring this challenge. It has (1) an injury in fact (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision. *See Phillips v. DeWine*, 841 F.3d 405, 414 (6th Cir. 2016) (citing *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560 (1992)). Chilling speech and unconstitutionally compelling speech are injuries in fact. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764–65 (6th Cir. 2019).

78.    *First*, Glass Lewis has shown an injury. In a pre-enforcement challenge, a plaintiff can establish injury in fact if it alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

79.    Glass Lewis intends to—and will—engage in a course of conduct affected with a constitutional interest. Glass Lewis engages in First Amendment protected speech and expression when it provides advice and recommendations on how to vote on shareholder-sponsored proposals and company proposals, distributes proxy statement research and analytics on those proposals, generates ratings and research regarding corporate governance, and develops proxy voting recommendations and policies. S.B. 183 § 1(10). These services consist of speech and are at the core of Glass Lewis' business. Thus, Glass Lewis intends to engage in a course of conduct

protected by the First Amendment by providing "proxy advisory services" that will be regulated by S.B. 183.

80.     The Act proscribes the course of conduct that Glass Lewis would engage in without the threat of enforcement by the Attorney General—to provide advice and recommendations about companies after July 15, 2026, without including Kentucky's views compelled by Section 2 of the Act.

81.     Absent S.B. 183, Glass Lewis' speech would not convey Kentucky's views reflected in Section 2. For example, Glass Lewis would not convey Kentucky's viewpoint—with which Glass Lewis vehemently disagrees—that consideration of purported "nonpecuniary" factors makes advice not in the interest of shareholders. S.B. 183 §§ 1(13), 2. Glass Lewis' core business involves tailoring its recommendations to clients based on their varying views of what constitutes a material factor for investments. Institutional investor clients often retain Glass Lewis precisely because Glass Lewis can customize its recommendations to consider the particular factors those investors believe are material, which frequently includes factors that Attorney General Coleman may himself consider immaterial. It is hard to imagine statements more antithetical to Glass Lewis' views, business, and purpose than those compelled by Section 2.

82.     Additionally, absent S.B. 183, Glass Lewis' speech would not convey Kentucky's viewpoint that providing differing advice to differently situated clients necessarily means one client is not receiving advice in the interest of shareholders. S.B. 183 § 2(3).

83.     The threat of enforcement is substantial. Each violation of the Act qualifies as an "unfair, false, misleading, or deceptive act or practice," meaning that the Attorney General can seek penalties of $2,000 per violation. S.B. 183 § 3; Ky. Rev. Stat. § 367.990(2). If each report to

each client were to qualify as a violation with a $2,000 penalty, the total penalties for each month could easily exceed hundreds of thousands per report about Kentucky companies.

84.     The Attorney General's Office has shown a clear intent to enforce the Act. Kentucky's previous Attorney General co-signed a demand letter to Glass Lewis and ISS accusing them of violating various states' "prohibitions on unfair or deceptive trade practices" by providing proxy advice based on environmental, social, and governance ("ESG") and diversity, equity, and inclusion ("DEI") factors.[6] He also co-signed a letter to Congress criticizing a Department of Labor rule for "embrac[ing] managers' use of ESG factors in investment decisions and proxy voting."[7] And in 2022, he issued an opinion criticizing the "increasing trend among some investment management firms to use money in public and state employee pension plans—that is, other people's money—to push their own political agendas and force social change," and concluding this violates Kentucky law.[8] Attorney General Coleman has not rescinded this opinion.

85.     *Second*, these injuries are fairly traceable to the Attorney General. The Act expressly states that a violation of the Act is enforceable as a violation of the Consumer Protection Act, and may be prosecuted using "[a]ll of the remedies, powers, and duties provided to the Attorney General under KRS 367.110 to 367.300, and the penalties provided in KRS 367.990." S.B. 183 § 3(3).

86.     *Third*, a declaration and injunction would remove the substantial threat of civil suit by the Attorney General. *See Steffel v. Thompson*, 415 U.S. 452, 474-75 (1974); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015).

---

[6] Letter from State Attorneys General to ISS and Glass Lewis (Jan. 17, 2023), https://perma.cc/NNW4-64B4.

[7] Letter from State Attorneys General to Congress (Feb. 14, 2023), https://perma.cc/D7XF-AU98.

[8] Commonwealth of Kentucky, Office of the Attorney General, Opinion No. 22-05 (May 26, 2022), https://perma.cc/E56N-YLK9.

87.    The Attorney General is not immune under the Eleventh Amendment because this is a pre-enforcement challenge seeking prospective relief for ongoing violations of federal law. *See Ex parte Young*, 209 U.S. 123 (1908).

88.    The *Ex parte Young* exception applies because the Attorney General has "some connection" to enforcement. *Russell*, 784 F.3d at 1048. "Enjoining a statewide official under *Young* based on his obligation to enforce a law is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Id.* That realistic possibility exists here.

89.    The Act expressly authorizes the Attorney General's enforcement, so the Attorney General has a particular duty to enforce it. S.B. 183 § 3. "As eight Members of the Court agree, petitioners may bring a pre-enforcement suit challenging the Texas law in federal court under *Ex parte Young* because there exist state executive officials who retain authority to enforce it." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 59-60 (2021) (Roberts, C.J., concurring in part and dissenting in part).

90.    The Attorney General's authority to enforce the Act's compelled speech provisions, and the Attorney General's Office's demonstrated intent to do so, subjects him to a right of action under *Ex parte Young*. The Attorney General may seek $2,000 per violation as well as declaratory and injunctive relief. S.B. 183 § 3; Ky. Rev. Stat. §§ 367.190, 367.990.

## CLAIMS

91.    Glass Lewis raises a challenge to S.B. 183 as applied to Glass Lewis.

## COUNT I

### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT (FREEDOM OF SPEECH)

92.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

93.     The First Amendment to the U.S. Constitution provides that the government "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. When the Government regulates speech, it "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

94.     The First Amendment "protect[s] the freedom to think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (citation and quotation marks omitted). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

95.     The Act engages in viewpoint-based discrimination. Without the need for any strict scrutiny analysis, the "Court's finding of viewpoint bias" effectively "end[s] the matter." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). The Act also engages in content-based discrimination and fails strict scrutiny. Although the Act does not regulate commercial speech, it also fails under intermediate scrutiny.

96.     **Viewpoint discrimination**. The "First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others[.]" *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993). S.B. 183 discriminates based on viewpoint when it subjects certain viewpoints to rigorous regulation but not their counterpoints. Worse, it compels private speakers to adopt and parrot the government's viewpoint on hotly contested topics.

97.     Viewpoint discrimination is a "particularly egregious form of content discrimination." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (citation omitted). "A viewpoint-based regulation targets . . . particular views taken by speakers on a subject." *Id.* (citation omitted).

25

98.    The Act targets particular views taken by Glass Lewis. When Glass Lewis' advice supports the relevance of so-called "non-pecuniary interest[s]" to shareholder value *or* expresses disagreement with the views of a company's board, Section 2(2) heavily regulates that speech. *See* S.B. 183 § 2. On the contrary, advice that disparages the relevance of governance and diversity does not trigger regulation. Likewise, advice agreeing with company management avoids regulation. So, expressing views that "management is wrong, so don't vote with management" results in *substantial* burdens, while expressing "management is right, so vote with management" results in *no* burdens. And the Act punishes Glass Lewis for taking the view that so-called "nonpecuniary interest[s]" are relevant to shareholder value, but not the opposite view.

99.    Section 2(3) also engages in viewpoint-based discrimination. Section 2(3) targets "materially different" advice to different clients. *Id.* § 2(3). Glass Lewis must "disclose the advice or recommendation" that is "[p]rovided solely in the interest of shareholders" and "[s]upported by an economic analysis performed and relied upon by the proxy advisor," incorporating the blatant viewpoint discrimination found in Sections 1 and 2. And again, expressing agreement with management escapes regulation, while expressing disagreement with management is heavily burdened.

100.    Restricting speech with certain viewpoints was the express intent of the bill's sponsor: "[W]e passed Senate Bill 183 to protect [against] activist investors who seek to push their ideological agendas on our society through publicly traded companies typically to the detriment of the company's employees and investors." Ky. Senate Chambers Hr'g at 4:19-24 (Feb. 10, 2026) (statement of Sen. Nunn) (video at https://ket.org/legislature/archives/2026/regular/senate-chambers-8egjh6). S.B. 183 is "meant to prevent proxy voting recommendations from being made based on" factors the General Assembly disagrees with: "for example, social, political, or

26

ideological interest." Ky. Senate Economic Development, Tourism & Labor Committee Hr'g at 4:16-19 (Feb. 5, 2026) (statement of Sen. Nunn) (video at https://ket.org/legislature/archives/2026/regular/senate-economicdevelopment-tourism-labor-committee-room-169-74macd).

101.   This is viewpoint discrimination. The purpose is to "excis[e] certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642 (1994). The Act impermissibly seeks to "tilt public debate in a preferred direction" and "interfere with an uninhibited marketplace of ideas." *Sorrell*, 564 U.S. at 578-79; *303 Creative*, 600 U.S. at 585.

102.   Both on its face and in its purpose, the Act impermissibly seeks to "interfere with an uninhibited marketplace of ideas." *303 Creative*, 600 U.S. at 585 (citation and quotation marks omitted).

103.   The Act also discriminates on viewpoint when it compels Glass Lewis to speak the Kentucky government's viewpoints—even when they contradict Glass Lewis' own perspective. Kentucky "seeks to compel this speech in order to 'excis[e] certain ideas or viewpoints from the public dialogue.'" *303 Creative*, 600 U.S. at 588 (quoting *Turner Broadcasting*, 512 U.S. at 642); *see Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 14-15 (1986). The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n. of State, Cnty., & Mun. Employees, Council 31*, 585 U.S. 878, 892 (2018) (collecting cases) (quotation marks omitted). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command[.]" *Id.*; *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*"). The "government may not compel a person to speak its own preferred messages." *303*

27

*Creative*, 600 U.S. at 586. "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." *Id.* at 586-87 (citations omitted).

104.    The Act compels Glass Lewis to make disparaging statements and notices about its own services to its clients. S.B. 183 § 2. Compelled statements impermissibly "alter[] the content of [Glass Lewis'] speech." *NIFLA*, 585 U.S. at 766. They force Glass Lewis to "provide a government-drafted script" advocating positions it opposes. *Id.*

105.    Section 2(2) requires Glass Lewis to state the government's view that any advice which considers "environmental, social, political, or ideological interest[s]" is "not being provided solely in the interest of shareholders" because it is based on "nonpecuniary factors." S.B. 183 §§ 1(7), 2(2)(a). That section also requires Glass Lewis to state the government's view that its recommendations to support shareholder proposals are "not being provided solely in the interest of shareholders and that the advice subordinates the financial interests of shareholders to other objectives" in situations where Glass Lewis does not believe that. "[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

106.    Likewise, Section 2(3) demands that, whenever Glass Lewis provides materially different advice to different clients, it must state which advice is "provided solely in the interest of shareholders" and "[s]upported by an economic analysis," and, by implication, which is not—even if it does not believe that is true. S.B. 183 § 2(3).

107.    Thus, whenever Glass Lewis wishes to speak with a certain viewpoint, the Act compels Glass Lewis to speak the Kentucky government's viewpoints. *See Pac. Gas & Elec. Co.*, 475 U.S. at 16 ("Were the government freely able to compel corporate speakers to propound political messages with which they disagree, this protection would be empty, for the government could require speakers to affirm in one breath that which they deny in the next."). It is similar to the unconstitutional law in *303 Creative*: Here, Kentucky "seeks to put [Glass Lewis] to a similar choice: If [it] wishes to speak, [it] must either speak as the State demands or face sanctions for expressing [its] own beliefs." 600 U.S. at 589. Under the Supreme Court's precedents, that is "more than enough[] to represent an impermissible abridgment of the First Amendment's right to speak freely." *Id.*

108.    Viewpoint discrimination "is inherent in the design and structure of this Act." *NIFLA*, 585 U.S. at 779 (Kennedy, J., concurring). "[T]he history of the Act's passage . . . suggest[s] a real possibility that" proxy advisors' speech was targeted because the State disagrees with the positions they have taken. *Id.* The purpose of the Act is to punish disfavored viewpoints, whether those views advocate for the relevance of environmental, social, political, and ideological factors or against company management. A "State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741. "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42.

109.    The Act's blatant viewpoint discrimination, by itself, renders S.B. 183 unconstitutional. "In the ordinary case it is all but dispositive to conclude that a law is . . . viewpoint discriminatory." *Id.* at 741. Without the need for any strict scrutiny analysis, "[t]he Court's finding of viewpoint bias end[s] the matter." *Iancu*, 588 U.S. at 399. "Modern First Amendment cases

establish a *per se* rule making the punishment of speech flatly unconstitutional if the penalty is based on the offensiveness or the undesirability of the viewpoint expressed. . . . While the First Amendment as a whole is not an absolute, the prohibition against viewpoint discrimination is a 'pocket of absolutism' in which the Supreme Court has tolerated no abridgments." 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 4:8 (Mar. 2025).

110.   Kentucky is entitled to its view of what factors are relevant to shareholder interests. It may not, however, compel proxy advisors to parrot that view, nor regulate their speech because Kentucky disagrees with their views. "The government may not discriminate against speech based on the ideas or opinions it conveys," full stop. *Iancu*, 588 U.S. at 393.

111.   **Content-based discrimination**. The Act also fails because it engages in content discrimination and fails strict scrutiny.

112.   A law is content based if it "target[s] speech based on its communicative content." *NIFLA*, 585 U.S. at 766 (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). It does so when "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (quotation marks omitted). That is undeniably the case here, because the Act regulates reports based on the content of Glass Lewis' advice and their ultimate recommendations.

113.   Additionally, a compelled "notice is a content-based regulation of speech." *NIFLA*, 585 U.S. at 766. "By compelling individuals to speak a particular message, such notices 'alter the content of their speech.'" *Id.* (cleaned up); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988) (the First Amendment protects the freedom to decide "both what to say and what *not* to say").

30

114.    **Strict Scrutiny applies, and the Act does not survive it**. Because the Act engages in content-based discrimination, it is subject to strict scrutiny, which it fails.

115.    "Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. This is true even of laws that regulate commercial speech—"[A] regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020). "Strict scrutiny is unforgiving because it is the standard for reviewing the direct targeting of fully protected speech. Strict scrutiny is designed to enforce the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025) (citation and quotation marks omitted). In practice, it must be "fatal in fact absent truly extraordinary circumstances." *Id.*

116.    The Act's express goal is to "prevent proxy voting recommendations" based on disfavored viewpoints. Ky. Senate Economic Development, Tourism & Labor Committee Hr'g at 4:16-19    (Feb.    5,    2026)    (statement    of    Sen.    Nunn)    (video    at https://ket.org/legislature/archives/2026/regular/senate-economicdevelopment-tourism-labor-committee-room-169-74macd). The General Assembly did not even attempt to conceal this unconstitutional purpose with a facially neutral, pretextual justification. The Act therefore flunks strict scrutiny.

117.    Moreover, the Act is "wildly underinclusive." *NIFLA*, 585 U.S. at 774 (citation omitted). "Such underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.*

31

(cleaned up); *City of Ladue v. Gilleo*, 512 U.S. 43, 51-52 (1994) (underinclusiveness may "diminish the credibility of the government's rationale for restricting speech in the first place").

118. Even if the State had articulated a genuine compelling interest, the Act fails strict scrutiny because it is not narrowly tailored to serve any such interest.

119. Glass Lewis exclusively serves highly sophisticated institutional clients who know whether to consider environmental, social, political, or ideological factors. The majority use custom voting policies, and all Glass Lewis clients choose their voting policy and thereby tell Glass Lewis when and how they want to consider such factors. Glass Lewis is transparent about how it considers the factors at issue. Glass Lewis' voting policies and Proxy Papers *already* inform clients what Glass Lewis has considered. Glass Lewis' sophisticated clients are not deceived by its speech, so government-mandated warnings will not reduce fraud.

120. There is nothing inherently fraudulent or improper about the targeted speech. Proxy advisers appropriately give different recommendations to different clients who have different investment preferences and situations. That differing advice does not indicate fraud—only that differently situated clients can have different interests and approaches. A long-term investment outlook might appropriately factor in sustainability and climate change, while a short-term outlook might not. Nor is there anything fraudulent in recommending a vote against the position of the company's management or board. S.B. 183 § 2(1)(b)-(c). Shareholders regularly vote against company management, especially when management's proposal is self-interested. So, targeting this speech, which is not at all fraudulent, will not reduce fraud.

121. The Act's regulatory technique, a sweeping scheme of self-denigrating statements, does not use "the least restrictive means" available. *Free Speech Coal.*, 606 U.S. at 484. Kentucky could conceivably have regulated material misrepresentations or regulated instances where proxy

advisors failed to follow their client's chosen voting policies. And the General Assembly's failure to consider other, less burdensome alternatives, such as a "government-funded public information campaign," is fatal. *See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 284 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025); *Sec. Indus. & Fin. Mkts. Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 800 (W.D. Mo. 2024); *NIFLA*, 585 U.S. at 775. Further, the Act's compelled statements do not correspond to the speech that triggers them. For example, Glass Lewis may be required to state that its recommendation "sacrific[es] investment returns or undertak[es] additional investment risk to promote . . . nonpecuniary interests" even if it considered no "nonpecuniary" interests, merely because its recommendation conflicts with that of the company's board. S.B. 183 §§ 2(1)(b)-(c), 2(2)(a)(1). This mismatch between the content of the triggering speech and the compelled statements is fatal under strict scrutiny.

122. Because the Act discriminates based on the content of speech and is not narrowly tailored to serve a compelling state interest, the Act violates the First Amendment.

123. **The Act does not regulate commercial speech**. Commercial speech doctrines are inapplicable to laws that discriminate against viewpoints. *Sorrell*, 564 U.S. at 566; *see also Int'l Outdoor*, 974 F.3d at 703 ("[T]he intermediate-scrutiny standard applicable to commercial speech . . . applies only to a speech regulation that is content-neutral on its face."). Even setting that aside, the Act does not regulate commercial speech, so no lower standard of scrutiny applies.

124. The "core notion" of commercial speech is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (citation and quotation marks omitted). That speech "has an economic motivation" is "insufficient by itself" to turn it into commercial speech. *Id.* at 67. The Supreme Court has defined commercial

speech as expression that does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976).

125.    Glass Lewis' proxy advice—especially that speech regulated by the Act—is not commercial speech. Its proxy advisory services are analogous to the editorial opinions of a newspaper or the endorsement of a political candidate: they offer judgment and analysis, not products. Glass Lewis' speech does not "propose a commercial transaction"—the "core notion" of commercial speech. The fact that Glass Lewis provides speech for compensation is "insufficient by itself" to transform it into commercial speech. *See Bolger*, 463 U.S. at 66-67; *Sorrell*, 564 U.S. at 567. Glass Lewis' reports reflect its opinions and interpretations of information about matters of public concern. And as the D.C. Circuit has confirmed, proxy-voting advice is "simply a recommendation." *Institutional Shareholder Servs., Inc. v. SEC*, 142 F.4th 757, 768 (D.C. Cir. 2025).

126.    Glass Lewis' Proxy Papers relate to matters of significant public concern, and while they might be provided to financial institutions, they fall squarely within the realm of pure speech. The reports address contested questions of corporate governance, executive accountability, and shareholder rights that lie at the intersection of finance and public policy. For example, recent Glass Lewis reports include a recommendation for Warner Bros. shareholders to vote with management for Paramount's acquisition,[9] and for BP shareholders to vote against management

---

[9] *Proxy adviser Glass Lewis recommends Warner Bros shareholders vote for Paramount deal*, Reuters (Apr. 10, 2026), https://www.reuters.com/legal/transactional/proxy-adviser-glass-lewis-recommends-warner-bros-shareholders-vote-paramount-2026-04-10.

on a proposal to change course and stop making certain climate disclosures.[10] Both votes implicate matters of significant public concern related to live, ongoing political debates.

127.    **Even if _Central Hudson_ intermediate scrutiny applies, the Act fails**. "Even assuming that the less stringent form of First Amendment review applies, [Kentucky's] law does not pass. Under that standard, a law must further a substantial governmental interest that is unrelated to the suppression of free expression. . . . But the interest [Kentucky] has asserted cannot carry the day: It is very much related to the suppression of free expression, and it is not valid, let alone substantial." _Moody_, 603 U.S. at 740. Indeed, S.B. 183 was passed expressly to "prevent proxy voting recommendations from being made based on . . . social, political, or ideological interest[s]." Ky. Senate Economic Development, Tourism & Labor Committee Hr'g at 4:16-19 (Feb.    5,    2026)    (statement    of    Sen.    Nunn)    (video    at https://ket.org/legislature/archives/2026/regular/senate-economicdevelopment-tourism-labor-committee-room-169-74macd). Rather than advancing any legitimate governmental interest, the Act distorts the free flow of information to sophisticated institutional investors by compelling false and misleading statements.

128.    The government cannot rely on "mere speculation or conjecture" to justify a commercial speech regulation, and must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." _Pagan v. Fruchey_, 492 F.3d 766, 771 (6th Cir. 2007) (quoting _Fla. Bar v. Went For It, Inc._, 515 U.S. 618, 625-26 (1995)); _see Edenfield v. Fane_, 507 U.S. 761, 770-71 (1993). "[T]he government must come forward with some quantum of evidence, beyond its own belief in the necessity for regulation, that the harms it seeks to remedy

---

[10] Shadia Nasralla & Stephanie Kelly, _BP Shareholders Reject Two Board Proposals as Chair Gets Lower-Than-Typical Support_, Reuters (Apr. 23, 2026), https://www.reuters.com/legal/transactional/bp-fails-get-shareholder-majority-approval-two-agm-resolutions-2026-04-23.

are concrete and that its regulatory regime advances the stated goals." *Pagan*, 492 F.3d at 771. Kentucky can make no such showing. The legislative history unmistakably demonstrates that the Act's true purpose is viewpoint-discriminatory; any other alleged purpose Kentucky manufactures to justify the law would be pretextual.

129.    S.B. 183 also flunks the other *Central Hudson* factors.

> Under *Central Hudson*, the government may freely regulate commercial speech that concerns unlawful activity or is misleading. Commercial speech that falls into neither of those categories . . . may be regulated if the government satisfies a test consisting of three related prongs: First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be narrowly drawn.

*Fla. Bar*, 515 U.S. at 623-24 (quotation marks and citations omitted).

130.    Glass Lewis' services are lawful and its advice on matters of judgment is reasoned, clear, and not misleading. Thus, the government's authority to "freely regulate" speech that is misleading or concerns unlawful activity does not apply. *Id.*

131.    S.B. 183 is vastly more extensive than necessary: rather than addressing any actual, identified harm, it imposes onerous compelled-speech obligations that burden far more speech than could conceivably be justified. There is no "reasonable fit between the legislature's ends and the means chosen to accomplish those ends." *Pagan*, 492 F.3d at 771. And the General Assembly's failure to consider the "numerous and obvious less-burdensome alternatives to the restriction on commercial speech" is fatal. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993); *see NIFLA*, 585 U.S. at 775.

132.    Because S.B. 183's unconstitutional content- and viewpoint-based triggering provisions and compelled speech requirements are integral to the entire law and its express purpose, the entire law must be invalidated and enjoined as to Glass Lewis. Unless invalidated and

enjoined as to Glass Lewis, S.B. 183 will deprive Glass Lewis of its First Amendment rights and cause it to suffer irreparable injuries.

## COUNT II

**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**

133.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

134.    The Due Process Clause demands that a statute give regulated parties fair notice of what it requires and constrain enforcement discretion so that the Act is not applied in an arbitrary or discriminatory manner. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). These requirements apply with special force where, as here, the Act regulates speech—because vague speech regulations inevitably chill constitutionally protected expression. *Id.*

135.    S.B. 183 flunks both prongs of the vagueness inquiry as applied to Glass Lewis. The statute is vague both in the conditions that trigger its compelled-speech requirements and in the substance of what those requirements demand.

136.    The Act's triggering conditions are hopelessly ambiguous. For example, a proxy advisory service triggers Section 2(2)'s compelled-speech requirement if it is "wholly or partly based on, or otherwise takes into account, one (1) or more nonpecuniary interests or subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote or further nonpecuniary interests." S.B. 183 § 2(1)(a). But the Act defines "nonpecuniary interest" with reference to a few non-exclusive examples: "'Nonpecuniary interest' *includes but is not limited to* an environmental, social, political, or ideological interest which does not have a direct and material connection to the financial risk or financial return of an investment." *Id.* § 1(7) (emphasis added). There is no way for Glass Lewis to determine what interests besides those listed qualify as "nonpecuniary

37

interests." And even the listed interests are too broad to provide any meaningful guidance. Notably, the Act provides no guidance on what it means for a connection to be "direct," and the definition of "material connection" provides no meaningful guidance. The result is that the Attorney General is empowered to determine the meaning of the phrase on an ad hoc basis, depriving Glass Lewis of fair notice as to what speech will trigger compelled statements.

137. In an analogous case, a federal court struck down as vague a Missouri rule requiring securities firms to obtain consent before incorporating a "'nonfinancial objective' into their securities recommendations or investment advice." *Ashcroft*, 745 F. Supp. 3d at 790, 800-01.

138. The same is true here: the definition of "solely in the interest of the shareholders" and "nonpecuniary interest" are open-ended and provide only vague examples to guide proxy advisors seeking to comply with the law. A wrong guess can result in $2,000 penalties for each violation. Ky. Rev. Stat. § 367.990.

139. The Act also suffers from poor drafting that renders it vague. The Act defines "proxy advisory service" as "services that are provided in connection with or in relation to a company." S.B. 183 § 1(10). Company means "a publicly traded for-profit corporation, limited liability company, partnership, or other business entity that is doing business in this state as defined in KRS 141.010(13)." *Id.* § 1(1). But it is unclear whether "that is doing business in this state" modifies "other business entity" only, or also modifies "a publicly traded for-profit corporation, limited liability company, [and] partnership." The consequences of this ambiguity are enormous: if "in this state" only modifies "other business entity," then the Act covers proxy advice to all companies nationwide. If Glass Lewis interprets the statute and guesses wrong, S.B. 183 imposes ruinous liability of $2,000 per violation.

140.    Likewise, S.B. 183 requires distribution of the compelled speech to "each shareholder or entity or other person acting on behalf of a shareholder receiving the proxy advisory service." *Id.* § 2(2)(a). But it is unclear if the phrase "receiving the proxy advisory service" modifies "each shareholder." In other words, does Glass Lewis need to provide its analysis to all shareholders, or only those shareholders who directly receive its advice? Again, poor drafting creates an unresolvable ambiguity with drastic liability for the wrong interpretation.

141.    As another example, it is unclear what a proxy advisor must do if it tries to produce an "economic analysis" but the issue does not lend itself to the kind of forward-looking quantification demanded by S.B. 183's definition of "economic analysis": Would the Act permit Glass Lewis to say that any "long term and short term" benefits and costs are unclear, to discuss them in general or qualitative terms, or to say that Glass Lewis cannot determine the "quantifiable impact of the shareholder-sponsored proposal . . . on the investment returns of the shareholder receiving the advice?" *Id.* § 1(4). Or must Glass Lewis state that it made the recommendation without conducting this so-called "economic analysis"?

142.    If the required statements are triggered, S.B. 183 leaves substantial uncertainty about how Glass Lewis should comply. For instance, the Act does not explain what counts as a "conspicuous" statement. *Id.* § 2(2)(a)(1). The Act also seemingly requires Glass Lewis to "[c]onspicuously state[]" that its service "is not being provided solely in the interest of shareholders and that the advice subordinates the financial interests of shareholders to other objectives . . . to promote one (1) or more nonpecuniary interests" even if its speech triggered compelled statements not because it was based on "nonpecuniary" interests, but because it recommended a vote against the recommendation of the company's board. *Id.* § 2(1)(b), (2)(a)(1).

143.    The result is a statute that arms the Attorney General with standardless discretion. Because the Act provides Glass Lewis no reliable way to determine what compliance looks like, it equally provides no "minimal guidelines to govern law enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citation omitted). Enforcement thus turns on the Attorney General's subjective judgment—his "personal predilections"—about whether Glass Lewis has done enough. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted).

144.    The stakes of this vagueness are severe. S.B. 183 authorizes quasi-criminal civil penalties of up to $2,000 "per violation." Ky. Rev. Stat. § 367.990(2). Given the volume of Glass Lewis' proxy advisory activity, even a single proxy season of purported noncompliance could generate penalties in the tens of millions of dollars. That draconian enforcement threat compounds the chilling effect of the Act's ambiguity, pressuring Glass Lewis not to exercise its First Amendment rights.

145.    Because S.B. 183's unconstitutionally vague provisions are integral to the entire law, the entire law must be invalidated and enjoined as to Glass Lewis.

146.    Unless declared unconstitutional and its enforcement enjoined, S.B. 183 will unlawfully deprive Glass Lewis of its Due Process rights and cause Glass Lewis irreparable harm.

## COUNT III

### U.S. CONST., ART. I, § 8, CL. 3
### VIOLATION OF THE DORMANT COMMERCE CLAUSE

147.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

148.    "The Commerce Clause provides that 'Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States.' Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of

40

a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (citation omitted) (quoting U.S. Const., art. I, § 8, cl. 3). The dormant Commerce Clause safeguards "the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce" and the "autonomy of the individual States within their respective spheres." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989). These protections extend with equal force to foreign commerce. *See Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 7-8 (1986); *South-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984).

149.    The dormant Commerce Clause analysis has two steps: "At step one, a court must ask if a challenged state law 'discriminates' against out-of-state economic interests to benefit local economic interests. . . . [A]t step two[, the question is] whether [the law] nevertheless inflicts a 'substantial harm' on interstate commerce." *Truesdell v. Friedlander*, 80 F.4th 762, 768 (6th Cir. 2023). A law violates the Commerce Clause if its "interstate burdens clearly exceed its in-state benefits." *Id.* (cleaned up).

150.    A state law also violates the dormant Commerce Clause when it directly regulates commerce that occurs wholly outside of the state's borders. *Tyson Foods, Inc. v. McReynolds*, 865 F.2d 99, 101 (6th Cir. 1989); *see Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar*).

151.    S.B. 183 fails that test. The Act was intended to "protect every Kentuckian that works at or invests in a publicly traded company by ensuring transparency and accountability of proxy voting advice." Ky. Senate Chambers Hr'g at 4:25-5:3 (Feb. 10, 2026) (statement of Sen. Nunn) (video at https://ket.org/legislature/archives/2026/regular/senate-chambers-8egjh6). But the shareholders who will receive the compelled statements need not reside in Kentucky and

41

neither must the companies who are the subject of the proxy advisory service—they just have to be doing business here. So, there is not necessarily any local benefit. Meanwhile, the Act burdens interstate commerce by requiring out-of-state proxy advisors to give out-of-state shareholders time-consuming, expensive, and distracting statements about companies that are not headquartered or incorporated here—indeed, that have as little connection to Kentucky as merely having one employee here.

152.   The Act covers advice about Kentucky companies, but potentially defines that term so broadly that it feasibly encompasses virtually every public company in the country. S.B. 183's compelled-speech requirements apply to any proxy advisory service made "in connection with or in relation to a company" that is "doing business" within Kentucky and defines that term by reference to Kentucky Revised Statute Section 141.010(13). That section includes companies that "hav[e] one (1) or more individuals performing services in this state;" "deriv[e] income from . . . sources within this state," and "direct[] activities at Kentucky customers for the purpose of selling them goods or services." Ky. Rev. Stat. § 141.010(13)(d)-(g). Glass Lewis has no way of determining whether a company meets these criteria, which likely encompass the vast majority of public companies in the United States, if not globally. Thus, S.B. 183 effectively applies to all public companies across the United States.

153.   S.B. 183 imposes substantial burdens on interstate and foreign commerce that far exceed any putative local benefit. Although the Act is vague, under one reading the Act sweeps in Glass Lewis' recommendations regarding companies without any Kentucky connection—that would include recommendations that any covered proxy advisor makes, anywhere in the world, about virtually any company that derives some income or provides some service in Kentucky. Ky. Rev. Stat. § 141.010(13). Because proxy advisory firms are headquartered outside Kentucky and

overwhelmingly serve out-of-state and foreign clients, the Act's compliance burdens fall almost entirely on interstate and foreign commerce.

154.    The resulting market distortion is itself a burden on commerce. If Kentucky's approach is replicated by other states—as appears likely given the coordinated lobbying campaign behind S.B. 183—proxy advisors will face a patchwork of conflicting state compelled-speech regimes, each layering its own idiosyncratic requirements onto every recommendation. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring in the judgment); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583-84 (1986). Such balkanization is precisely the evil the dormant Commerce Clause is designed to prevent. And S.B. 183's interference with foreign commerce is especially problematic given "the special need for federal uniformity" in "foreign intercourse and trade." *Wardair Canada*, 477 U.S. at 8.

155.    The substantial burdens S.B. 183 imposes on interstate and foreign commerce outweigh any local interest Kentucky may have in regulating how Glass Lewis serves its clients.

156.    To the extent Kentucky has any local interests, they "could be promoted as well with a lesser impact on interstate activities," *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), including, for example, through educational campaigns.

157.    By imposing substantial burdens on interstate commerce that clearly exceed local benefits and regulating commerce occurring wholly outside Kentucky's borders, S.B. 183 violates the dormant Commerce Clause. Unless invalidated and enjoined as to Glass Lewis, S.B. 183 will cause Glass Lewis to suffer irreparable injuries.

## COUNT IV

## FEDERAL STATUTORY PREEMPTION UNDER 29 U.S.C. § 1001, ET SEQ. (ERISA)

158.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

43

159.    S.B. 183 is preempted by ERISA, 29 U.S.C. §§ 1001, et seq.

160.    ERISA has a "broad pre-emption provision," which states that ERISA "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137-38 (1990). Interpreting this language, the Supreme Court has held that ERISA preempts "a state law that has an impermissible 'connection with' ERISA plans, meaning a state law that governs a central matter of plan administration or interferes with nationally uniform plan administration." *Gobeille v. Liberty Mut. Ins.*, 577 U.S. 312, 320 (2016) (cleaned up) (citation omitted). ERISA preempts the Act because it inappropriately interferes with the information available to plan fiduciaries and puts a heavy thumb on the scale of what they should consider.

161.    Federal regulations require a plan fiduciary, such as an asset manager for a company pension plan, to "[e]valuate relevant facts that form the basis for any particular proxy vote." 29 C.F.R. § 2550.404a-1(d)(2)(ii). Fiduciaries' decisions "must be based on factors that the fiduciary reasonably determines are relevant to a risk and return analysis." *Id.* § 2550.404a-1(b)(4). "Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors[.]" *Id.* "Whether any particular consideration is a risk-return factor depends on the individual facts and circumstances." *Id.* Thus, fiduciaries must consider "relevant facts," which, in various circumstances, will include environmental, social, or governance factors.

162.    ERISA also regulates fiduciaries' use of proxy advisors. A fiduciary may not "follow[] the recommendations of a proxy advisory firm . . . without a determination that such firm['s] . . . proxy voting guidelines are consistent with the fiduciary's obligations." 29 C.F.R. § 2550.404a-1(d)(2)(iii). So, when advising ERISA fiduciaries, Glass Lewis must evaluate

relevant facts and "risk and return" factors. Many of Glass Lewis' asset manager clients are ERISA fiduciaries. At these clients' requests, Glass Lewis signs certifications stating that it has considered relevant facts to show compliance with ERISA.

163.    The Act has the requisite connection with ERISA to fall within its broad preemption provision. S.B. 183 interferes with a central matter of plan administration by shaping the advice Glass Lewis may give its employee-benefit-plan clients and actively discouraging the consideration of relevant facts. In doing so, the Act differentiates advice about companies doing business in Kentucky and thereby disrupts a nationally uniform system. The Act's disclosure requirements affect the substance of the advice given to fiduciaries, which necessarily affects their decisions. If each state, based on its own views of environmental and social issues, can shape what factors asset managers and their advisers consider in voting on their state's companies (including those incorporated in other states), ERISA's nationally uniform regulation of fiduciaries' proxy voting decisions will be severely disrupted.

164.    The Act interferes with ERISA's requirements for fiduciaries and their advisors in three ways:

165.    *First*, the Act's disclosure requirements—as expressly intended by the Act's sponsor—discourage proxy advisors from considering facts and factors that must be considered under ERISA. *See Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 (recognizing effectiveness of requiring a company to publicly condemn itself to shape behavior). ERISA fiduciaries face an impossible choice under the law: ignore material financial considerations or follow advice that allegedly "subordinates the financial interests of shareholders."

166.    *Second*, when Glass Lewis considers all relevant facts (something ERISA fiduciaries must do), the Act requires it to make statements that both stigmatize its advice and

45

make it misleading. Because Glass Lewis must state that advice based on environmental or social factors "subordinates the financial interests of shareholders" and "sacrific[es] investment returns," the Act forces Glass Lewis to make misstatements to ERISA fiduciaries and thereby interferes with their ability to properly evaluate a proxy advisory firm's recommendation.

167.    *Third*, by following a proxy advisor's recommendation marred by the Act's warnings, the fiduciary exposes itself to lawsuits for considering allegedly inappropriate factors. ERISA requires that fiduciaries act "solely in accordance with the economic interest of the plan and its participants and beneficiaries." 29 C.F.R. § 2550.404a-1(d)(2)(ii)(A); *see Utah v. Micone*, 766 F. Supp. 3d 669, 686 (N.D. Tex. 2025) (opining that ERISA rules "do not permit a fiduciary to act for . . . other purposes than the beneficiaries' financial benefit"). By considering advice labeled as "not solely in the interest of shareholders," an ERISA fiduciary could be perceived to be violating its fundamental duty, opening itself to litigation. Perversely, the risk stems from doing just what ERISA requires (but the Act undermines): considering relevant facts.

168.    In an analogous case, a court held that Missouri rules requiring securities firms to obtain a specified form of written consent before incorporating "nonfinancial objectives" into their recommendations were preempted by ERISA. *Ashcroft*, 745 F. Supp. 3d at 797. These rules were preempted by ERISA because they restricted "what investments may be recommended or selected" and "mandate[d] disclosure and recordkeeping requirements not required by ERISA." *Id.*

169.    The Act imposes similar requirements and is similarly preempted by ERISA.

170.    Unless declared preempted and its enforcement enjoined, the Act will cause Glass Lewis irreparable harm.

## REQUESTS FOR RELIEF

### EQUITABLE RELIEF

171.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

46

172. S.B. 183 violates the Constitution and federal law, as applied to Glass Lewis, and deprives Glass Lewis of its enforceable rights secured by federal law.

173. Federal courts have the power to enjoin actions by state officials that violate federal law. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015).

174. This Court can and should exercise its equitable power to enter a preliminary injunction and a permanent injunction precluding Attorney General Coleman (and those in his office) from enforcing S.B. 183 against Glass Lewis.

## 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
## DECLARATORY RELIEF

175. Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

176. For the reasons discussed above, S.B. 183 violates the First and Fourteenth Amendments, including the Free Speech Clause and the Due Process Clause, as applied to Glass Lewis, and thereby deprives Glass Lewis of its enforceable rights.

177. For the reasons discussed above, S.B. 183 is void for vagueness under the Due Process Clause of the Fourteenth Amendment, as applied to Glass Lewis.

178. For the reasons discussed above, S.B. 183 violates the Dormant Commerce Clause, U.S. Const., art. I, § 8, cl. 3, as applied to Glass Lewis.

179. For the reasons discussed above, S.B. 183 is preempted by federal law, as applied to Glass Lewis.

180. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

181. This Court can and should exercise its power to enter a declaration that S.B. 183 is unconstitutional and otherwise unlawful, as applied to Glass Lewis.

47

## PRAYER FOR RELIEF

182. Glass Lewis respectfully requests that the Court:

183. Declare that S.B. 183 is unlawful, as applied to Glass Lewis;

184. Declare that S.B. 183 violates the First and Fourteenth Amendments, including the Free Speech Clause and the Due Process Clause, as applied to Glass Lewis;

185. Declare that S.B. 183 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment, as applied to Glass Lewis;

186. Declare that S.B. 183 violates the Commerce Clause, U.S. Const., art. I, § 8, cl. 3, as applied to Glass Lewis;

187. Declare that S.B. 183 is preempted by federal law, as applied to Glass Lewis;

188. Preliminarily and permanently enjoin Russell Coleman, in his official capacity as Attorney General of Kentucky—and his successors, agents, attorneys, employees, and all other persons who are in active concert or participation with the Attorney General—from enforcing S.B. 183 against Glass Lewis, including by intervening in any action;

189. Enter judgment in favor of Glass Lewis;

190. Award Glass Lewis its reasonable attorneys' fees and costs incurred in bringing this action, under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

191. Award Glass Lewis all other relief as the Court deems just and proper.

48

Dated: June 11, 2026

Respectfully submitted,

YETTER COLEMAN LLP

Bryce L. Callahan*
bcallahan@yettercoleman.com
Grant B. Martinez*
gmartinez@yettercoleman.com
Lily E. Hann*
lhann@yettercoleman.com
Jared LeBrun*
jlebrun@yettercoleman.com
Austin Brumbaugh*
abrumbaugh@yettercoleman.com
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
(713) 623-8002 (fax)

* motion for leave to appear *pro hac vice* forthcoming

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*