# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## FRANKFORT DIVISION

| | |
|---|---|
| GLASS, LEWIS & CO., LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:26-CV-00046-KKC |
| vs. | ) |
| | ) |
| | ) |
| RUSSELL COLEMAN, *in his official* | ) |
| *capacity as Attorney General of Kentucky*, | ) ORAL ARGUMENT REQUESTED |
| | ) |
| Defendant. | ) |

# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Introduction ................................................................................................................ 1

Background ................................................................................................................ 2

I.    Glass Lewis and the Proxy Advisory Industry. ............................................... 2

II.   Overview of S.B. 183 ...................................................................................... 5

Legal Standard ......................................................................................................... 8

Argument .................................................................................................................. 8

I.    The Court has jurisdiction ............................................................................... 8

II.   Likely Success on the Merits: The Act Violates the First Amendment ............. 9

      A.    The Act engages in viewpoint-based and content-based discrimination. .............. 9

            1.    The Act engages in pro-management, anti-dissent discrimination. .......... 10

            2.    The Act engages in discrimination against views that so-called "nonpecuniary interests" can be relevant to shareholder value. .............. 11

            3.    The Act discriminates against the view that different recommendations are appropriate for different clients with different strategies. ............................................................................................. 13

      B.    The Act impermissibly compels Glass Lewis' speech. ......................................... 15

      C.    The Act is either *per se* unconstitutional or fails strict scrutiny, the minimum standard that applies. ........................................................................ 16

      D.    No lesser standard of scrutiny applies. .................................................................. 18

            1.    The Act does not regulate commercial speech. ......................................... 19

            2.    Other requirements for *Zauderer*'s relaxed scrutiny are not present. ........ 19

            3.    The Act fails even under *Zauderer*'s relaxed standard. ........................... 21

III.  Likely Success on the Merits: The Act is Unconstitutionally Vague. ............... 22

      A.    Persons of ordinary intelligence must guess at the Act's meaning. ....................... 22

      B.    The Act invites arbitrary and discriminatory enforcement. ................................... 23

IV.   The Remaining Preliminary Injunction Factors Favor Glass Lewis ................ 24

      A.    Glass Lewis will suffer irreparable harm ............................................................. 24

      B.    The balance of equities and the public interest favor an injunction. .................... 25

Conclusion ............................................................................................................... 25

**INTRODUCTION**

Plaintiff Glass, Lewis & Co., LLC ("Glass Lewis") requests that, prior to July 15, 2026, the Court grant a preliminary injunction prohibiting Russell Coleman, in his official capacity as Attorney General of Kentucky—and his officers, agents, employees, attorneys, and all other persons who are in active concert or participation with him—from enforcing Kentucky's new S.B. 183 (the "Act," Ex. 1) against Glass Lewis. The Act is clearly unconstitutional. It targets the speech of proxy advisory firms like Glass Lewis, which institutional investors hire to provide research and recommendations on how to vote their shares at shareholder meetings.

The Act violates the First Amendment's core prohibition on viewpoint discrimination, "perhaps the greatest of free-speech evils." *Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 744 (6th Cir. 2025) (en banc). When Glass Lewis expresses *disagreement* with company management, the Act compels Glass Lewis (1) to provide government-mandated analysis or (2) to speak a government-mandated script or (3) to subject itself to government penalties for "deceptive" acts. But expressing *agreement* with management carries no burden. So, *significant* burdens for expressing the view "management is wrong, so don't vote with management"; but *no* burdens for expressing "management is right, so vote with management."

Another provision also engages in viewpoint-based and content-based discrimination. For speech that "takes into account" "environmental, social, political, or ideological" factors, the Act requires a government-mandated script or government penalties; but speech that disregards those factors is left alone. The Act's sponsor explained: "it's meant to prevent proxy voting recommendations from being made based on non-financial agendas, for example, social, political, or ideological interest." Ex. 11 at 4. Setting aside whether Glass Lewis does that, the government's *goal* is plainly unconstitutional. The Act is "meant to" suppress free expression: "to prevent" speech on "social, political, or ideological" topics, which lies at the heart of the First Amendment.

Thus, the Act's purpose is openly and directly related "to the suppression of free expression," so "the government may not pursue it consistent with the First Amendment." *Moody v. NetChoice, LLC*, 603 U.S. 707, 742 (2024). As the Supreme Court has explained, "a State may not interfere with private actors' speech to advance its own vision of ideological balance. . . . On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42. So, "a State cannot advance some points of view by burdening the expression of others"—exactly what the Act tries to do. *Id.* at 744. "To give government that power is to enable it to control the expression of ideas, promoting those it favors and suppressing those it does not. And that is what the First Amendment protects all of us from." *Id.* at 744.

Last year, a federal court enjoined enforcement of a near-identical Texas statute. *See* Text Order, *Glass, Lewis & Co., LLC v. Paxton*, No. 1:25-cv-1153 (W.D. Tex. Aug. 29, 2025). The minimal differences between the Texas law and S.B. 183 lack constitutional significance. Like the Texas law, S.B. 183 violates the Constitution, will cause irreparable harm, and should be enjoined.

## BACKGROUND

### I. Glass Lewis and the Proxy Advisory Industry.

#### A. Glass Lewis provides independent research and voting recommendations.

Institutional investors such as mutual funds and asset managers face thousands of shareholder votes every year across the companies in their portfolios. Decl. of John Wieck ("Wieck Decl.") ¶ 7. Those votes concern corporate governance and frequently implicate matters of significant public concern, including executive compensation, board composition, and shareholder proposals. *Id.* The proxy system is built around competing views: when shareholders submit proposals, company management (a company's leadership and board of directors) may respond in the proxy statement and "make arguments reflecting its own point of view, just as [shareholders]

may express [their] own point of view." 17 C.F.R. § 240.14a-8(m)(1).

The volume and complexity of proposals historically drove many institutions toward the so-called "Wall Street Rule": vote with management or sell shares. Ex. 22 at 1288. However, with the rise of index funds and forms of passive investing, selling is not an option. Ex. 23 at 2047. Rather than reflexively backing management or selling, institutional investors now turn to independent proxy advisors like Glass Lewis to provide research, analysis, and recommendations that allow investors to cast informed votes according to their own chosen criteria. Wieck Decl. ¶ 8.

Glass Lewis does this by collecting its independent research into a written report (a "Proxy Paper") that analyzes a company's upcoming proposals. *Id.* ¶ 9. A sample, generic Proxy Paper is attached as Exhibit 2. These reports consist of detailed analysis of a company's upcoming proposals, often running between 30 and 70 pages long. *Id.*; Exs. 3-5. Many reports consider what could be deemed an "environmental, social, political, or ideological" factor. Wieck Decl. ¶ 10. While market participants may debate the precise weight to afford environmental and social factors, the view that they *can be* at least indirectly relevant to shareholder value is widely held in the investment and business communities. *Id.*; Ex. 24.

**B.      Glass Lewis serves institutional investors with differing preferences.**

Glass Lewis allows clients to customize what recommendations they wish to receive based on their own voting preferences. Wieck Decl. ¶ 11. The majority of Glass Lewis' institutional-investor clients vote according to a custom policy, which caters to a client's specific fiduciary obligations, investment strategies, risk tolerances, and ideological preferences. *Id.* ¶ 12. Glass Lewis also offers thematic policies, such as a Climate Policy for investors focused on mitigating risks associated with climate change and a Catholic Policy that reflects the unique fiduciary responsibility of Catholic institutions. *Id.* And Glass Lewis offers a "Benchmark Policy" that

-3-

considers governance, environmental, social, financial, and reputational risks, based on a general consensus of investor views. *Id.*

Because different clients adopt different voting policies, it is common—and entirely expected and appropriate—for Glass Lewis to provide differing recommendations to different clients. *Id.* ¶ 11. Indeed, Glass Lewis has announced that it will move all clients off its Benchmark Policy by the end of 2027 and require them to receive recommendations under a custom or thematic policy chosen by that client. *Id.* ¶ 13. To Glass Lewis' knowledge, no client has ever complained that Glass Lewis offers this kind of customized, differentiated voting advice. *Id.*

The prevalence of custom policies reflects that votes on shareholder proposals are matters of opinion and subjective judgment. For decades, the SEC has recognized the subjective nature of proxy advice and speech on shareholder votes: "commentary concerning . . . the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint. Ex. 26 at 48,278 (SEC in 1992). The "formulation of proxy voting advice often requires subjective determinations and the exercise of professional judgment[.]" Ex. 27 at 43,181 (SEC in 2022). Glass Lewis' reports state the same: its recommendations are "solely statements of opinion, and not statements of fact, on matters that are, by their nature, judgmental." Wieck Decl. ¶ 37; Ex. 4 at 40; Ex. 5 at 55.

Glass Lewis does not serve retail investors, but rather sophisticated institutional-investor clients. Wieck Decl. ¶ 15. These include some of the world's largest public pension plans, hedge funds, and asset managers, collectively managing trillions of dollars. *Id.* Even at the low end, its clients manage tens of millions of dollars in assets, and their shareholder voting is typically handled by professionals with substantial training and experience in corporate governance and proxy voting. *Id.* As far as Glass Lewis knows, no client has ever claimed Glass Lewis' advice is

-4-

deceptive. *Id.* ¶ 16. Glass Lewis is not aware of any Kentucky client who has asked for the kind of compelled statement S.B. 183 requires. *Id.*

## II.    Overview of S.B. 183

S.B. 183 is one of a set of recently enacted state laws promoted by a D.C. lobbyist group. *See* Ex. 15 at 4:22-25; Exs. 25, 31. As noted above, it is nearly identical to a Texas law found likely unconstitutional last year. *See* Text Order, *Glass, Lewis & Co., LLC v. Paxton*, No. 1:25-cv-1153 (W.D. Tex. Aug. 29, 2025). Both the Texas law and S.B. 183 compel proxy advisors to speak the same government script whenever their advice is supposedly (1) "not solely in the interest of shareholders" or is (2) "materially different advice to different clients." *Compare* Tex. Bus. Orgs. Code §§ 6A.101, 102 *with* S.B. 183 § 2(1), (3).

S.B. 183 has two interrelated triggering mechanisms: Section 2(1) and Section 2(3).

### A.    Section 2(1) compels speech when advice reflects disfavored viewpoints.

Section 2(1) compels speech when Glass Lewis provides advice the Act deems "not solely in the interest of shareholders," S.B. 183 §§ 2(1)-(2), which (according to the Act) happens if:

- **Anti-management advice.** Glass Lewis recommends a vote on a shareholder proposal "inconsistent with the voting recommendation of the company's board of directors" without a prescribed written "economic analysis,"[1] or if it "[a]dvises against a company proposal to elect a governing person[.]" *Id.* § 2(1)(b)-(c).
- **"Nonpecuniary" advice.** Glass Lewis' speech "takes into account," any "nonpecuniary interest." "Nonpecuniary" is incompletely defined in an idiosyncratic way. It "includes but is not limited to an environmental, social, political, or ideological interest which does not have a direct and material connection to the financial risk or financial return of an investment." *Id.* §§ 1(7), 2(1)(a). A "material connection" is defined as what a "reasonable investor would consider important." *Id.* § 1(5). "Direct connection" is not defined.

---

[1] The Act defines "economic analysis" in plainly excessive and idiosyncratic terms. S.B. 183 § 1(4). The definition contains six subparts that must all be met, including whether the board of directors "opposes the" proposal, its "stated reasons for the opposition," the short- and long-term benefits and costs of the proposal, and an "explanation of the modeling, procedures, and processes used[.]" S.B. 183 § 1(4). No client has ever asked for this kind of analysis. Wieck Decl. ¶ 16.

Thus, the Act targets Glass Lewis for (1) disagreeing with management or (2) considering an environmental, social, ideological, or political factor while speaking. *Id.* §§ 2(1)(b)(1), 1(7).

If either of these criteria is met, the Act compels Glass Lewis to publicly and falsely disparage its own services: Glass Lewis must give each client a statement that "[c]onspicuously states that . . . the proxy advisory service is not being provided solely in the interest of shareholders and that the advice subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns[.]" *Id.* § 2(2)(a). Glass Lewis must also "[i]mmediately provide a copy of the" statement to "the company that is subject to the proxy advisory service," regardless of whether the company received the underlying advice. *Id.* § 2(2)(b).

### B.     Section 2(3) regulates advice against management and different advice given to different clients.

Section 2(3) is the second triggering provision. Like Section 2(1), Section 2(3) has a pro-management viewpoint bias: it compels speech whenever Glass Lewis speaks "in opposition to the recommendation of the company's management." *Id.* §§ 1(6), 2(3). It also compels speech whenever Glass Lewis "provides materially different advice to different clients." *Id.*

When Section 2(3) is triggered, the Act requires Glass Lewis to comply with Section 2(2)'s compelled statement regime described above. *Id.* § 2(3)(a). Section 2(3) then goes further, requiring Glass Lewis to somehow pick which recommendation was "[p]rovided solely in the interest of shareholders." *Id.* § 2(3)(b)(1). But Glass Lewis is not permitted to answer that question using its own professional judgment or its clients' chosen investment criteria. Instead, the Act supplies the answer by defining "solely in the interest of shareholders" to exclude advice that conflicts with management or considers disfavored "ideological" factors. *Id.* §§ 1(13), 2(3)(b)(1). Under Section 2(3), Glass Lewis must provide government-compelled scripts to its clients, to the company being discussed (which is often not a client), and to the Attorney General.

**C.      Kentucky passed the Act to suppress Glass Lewis' speech on disfavored views.**

The legislative history makes the Act's purpose plain. The sponsor said the Act is "meant to prevent proxy voting recommendations from being made based on non-financial agendas, for example, social, political, or ideological interest[s]." Ex. 11 at 4:16-23. He called proxy advisors "the perfect vehicle for activist investors," Ex. 12 at 5:8-9, and named "two firms in particular, ISS and Glass Lewis." Ex. 11 at 6:6-7. He pitched the Act as the sequel to a 2025 law aimed at punishing "activist investors who seek to push their ideological agendas on our society through publicly traded companies." Ex. 12 at 4:21-23. He framed the Act's object the same way: "keeping political and ideological matters away from shareholders and investors." Ex. 11 at 12:9-11. Repeatedly, the bill sponsor explicitly framed the Act's goals as "to prevent" speech—i.e., suppressing free expression.

Asked for "examples of what this bill is trying to" address—"what has happened in the past that would require this bill"—the Act's proponents could only offer more disfavored speech. Ex. 13 at 7:5-6. The sponsor explained that he dislikes "large proxy advisory firms, such as ISS and Glass Lewis" potentially aiding "an ideological or politically motivated desire[.]" *Id.* at 7:7-18. The legislative history never identified any Kentucky investor ever misled by proxy advice.

The Governor vetoed the Act to protect First Amendment rights. Ex. 16. The General Assembly overrode the veto and the Act takes effect July 15, 2026.

**D.      The Act expressly authorizes enforcement by the Attorney General.**

A violation of the Act is "deemed to be an unfair, false, misleading, or deceptive act or practice[.]" S.B. 183 § 3(1). The Act authorizes the Attorney General to investigate violations and seek $2,000-per-violation penalties and injunctive relief. *Id.* § 3(2)-(3); Ky. Rev. Stat. §§ 367.190, 367.990(2). Other parties may sue for declaratory or injunctive relief, and the Attorney General may intervene in those private actions. S.B. 183 § 3(2).

-7-

## LEGAL STANDARD

A preliminary injunction is warranted where the plaintiff is "likely to succeed on the merits," is "likely to suffer irreparable harm in the absence of preliminary relief," and shows that "the balance of equities tips in his favor" and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In First Amendment cases, "the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quotation marks omitted).

## ARGUMENT

### I. The Court has jurisdiction.

As the direct target of S.B. 183, Glass Lewis has standing to sue. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025). On injury-in-fact, Glass Lewis has both economic and constitutional injuries. Absent an injunction, Glass Lewis would be forced to divert resources from its regular business and expend significant amounts to develop the systems and hire personnel to comply with the Act. Wieck Decl. ¶¶ 24-26. Glass Lewis would suffer constitutional injury because: (1) it intends to continue providing speech that is covered by the Act; (2) the Act proscribes the course of conduct that Glass Lewis would engage in otherwise—providing advice to its clients without including the Act's compelled speech; and (3) the threat of enforcement is credible and substantial. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); Wieck Decl. ¶¶ 17, 19-23.

The injuries are directly traceable to Defendant Attorney General Coleman, who is charged with enforcing the Act. *See* S.B. 183 § 3; Ky. Rev. Stat. §§ 367.190, 367.990(2). An injunction would redress the injuries by eliminating the threat of enforcement and the corresponding impact on Glass Lewis' speech. *See Commonwealth v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023).

This suit also falls under the *Ex parte Young* exception to sovereign immunity. 209 U.S.

123 (1908); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015). The Attorney General's Office may investigate and prosecute violations of the Act, obtain injunctive relief and civil penalties, and has more than signaled its willingness to do so. *See* S.B. 183 § 3(3)(a), (b); Ky. Rev. Stat. §§ 367.190, 367.990(2); Exs. 17-21. "Enjoining a statewide official under *Young* based on his obligation to enforce a law is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Russell*, 784 F.3d at 1048.

## II.   Likely Success on the Merits: The Act Violates the First Amendment.

Glass Lewis will likely succeed on the merits. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000). The Attorney General cannot possibly meet his burden. The Act violates the First Amendment in numerous ways, discussed below.

### A.   The Act engages in viewpoint-based and content-based discrimination.

"[T]he government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). There are "two distinct but related limitations that the First Amendment places on government regulation of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015). Content-based discrimination targets *topics*; a "viewpoint-based regulation targets not merely a subject matter, but particular *views* taken by speakers on a subject," *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quotation marks omitted) (emphasis added). "Viewpoint discrimination represents an egregious form of content regulation, and governments in this country must nearly always abstain from it." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (cleaned up).

"At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring). The

Supreme Court recognizes that laws can engage in viewpoint discrimination in at least two ways: (1) "facial viewpoint bias"; and (2) viewpoint discrimination in purpose, "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Iancu v. Brunetti*, 588 U.S. 388, 394-95 (2019); *Rosenberger*, 515 U.S. at 829. The Act does both.

It also engages in subject-matter, content-based discrimination. "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Reed*, 576 U.S. at 169 (cleaned up). A law engages in content-based discrimination where it does any of the following: "target[s] speech based on its communicative content"; "applies to particular speech because of the topic discussed or the idea or message expressed"; "'on its face' draws distinctions based on the message a speaker conveys"; or was "adopted by the government because of disagreement with the message [the speech] conveys." *Id.* at 163-64 (quotation marks omitted). Any one of these formulations suffices.

### 1.   The Act engages in pro-management, anti-dissent discrimination.

On its face, the Act engages in pro-management, anti-dissent viewpoint discrimination: burdens are triggered by expressing the view "management is wrong" but not "management is right." For expressing disagreement with the views of company management, the Act imposes government-compelled analysis, compelled self-disparagement, or massive penalties; but expressing agreement with management results in no burdens. S.B. 183 § 2(1)(b) (triggered by views "inconsistent with the . . . recommendation of the . . . company's board of directors"); *id.* §§ 1(2), 2(1)(c) (triggered when Glass Lewis "[a]dvises against a company proposal," which is "a proposal made by a company"). *Every time* Glass Lewis advises against a proposal "in opposition to the recommendation of the company's management" it must tell numerous parties—every client receiving the advice, the company being discussed, *and the Attorney General*—that (1) it has given "materially different advice"; and (2) a specific recommendation is "[p]rovided solely in the

interest of shareholders." *Id.* §§ 1(6)(c), 2(3). Agreeing with management carries no burdens.

In addition to facial viewpoint bias, the purpose of the Act was to burden disagreement with management. As the Act's sponsor explained: "it's *meant to prevent* situations where a *proxy advisor pushes shareholders* to support a shareholder proposal *against the recommendation of the company's independent board*, but does so without providing a written economic analysis of what it will cost, what it will do, and how it impacts shareholders." Ex. 11 at 4:16-5:5 (emphasis added). The sponsor was transparent that these burdens, only on expressing disagreement with management, stem from his pro-management, anti-proxy advisor views: "A company's independent board has a fiduciary responsibility to the company and its shareholders. Proxy advisors do not have that same fiduciary responsibility. That's why it's very important that we do this." *Id.* at 5:6-10. Thus, the legislative sponsor confirmed that "the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

Thus, in favor of views agreeing with management and against dissenting views, the Act engages in both (1) facial viewpoint bias and (2) viewpoint discrimination in purpose. Either one is independently sufficient to render the Act unconstitutional. *See Iancu*, 588 U.S. at 394-95; *Rosenberger*, 515 U.S. at 829. As the Supreme Court explained earlier this year, the "Constitution does not protect the right of some to speak freely; it protects the right of all. It safeguards not only popular ideas; it secures, even and especially, the right to voice dissenting views." *Chiles*, 146 S. Ct. at 1024. "However well-intentioned, any law that suppresses speech based on viewpoint represents an 'egregious' assault on" the First Amendment. *Id.* at 1029.

> **2.    The Act engages in discrimination against views that so-called "nonpecuniary interests" can be relevant to shareholder value.**

On its face, the Act discriminates against the view that so-called "nonpecuniary interests"—such as "environmental, social" or other factors—can be indirectly relevant to

shareholder value and should be taken into account. When Glass Lewis' speech merely "takes into account" a "nonpecuniary interest" as defined by S.B. 183, the Act imposes compelled self-disparagement or massive financial penalties; but speech disparaging the relevance of such interests results in no burdens. S.B. 183 §§ 1(7), 2(1)(a), 2(2), 3. "Nonpecuniary interest" is defined as "an environmental, social," or other interest "which does not have a direct . . . connection" to financial risk or return. *Id.* § 1(7). So, if Glass Lewis says "we don't consider environmental and social issues because those are totally irrelevant," it incurs no burdens; but if it expresses the opposite view—"we take into account environmental and social factors because extensive research shows that they can have at least an indirect connection to financial risk"—the Act compels Glass Lewis to tell clients that its advice "subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk" and "is not being provided solely in the interest of shareholders" or subject itself to massive penalties. *Id.* §§ 1(7), 2(1)(a), 2(2), 3.

In addition to facial viewpoint bias, the purpose of the Act was "to prevent" speech reflecting the view that social and other factors can be relevant to financial performance. As the Act's sponsor explained: "it's meant to prevent proxy voting recommendations from being made based on non-financial agendas, for example, social, political, or ideological interest." Ex. 11 at 4:16-23. He described the Act as part of a campaign to stop "activist investors who seek to push their ideological agendas on our society." Ex. 12 at 4:21-23. He called proxy advisors "the perfect vehicle for activist investors," *id.* at 5:8-9, 5:8-10, and named "two firms in particular, ISS and Glass Lewis." Ex. 11 at 6:6-7. So, the legislative sponsor confirmed that "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

-12-

In addition to viewpoint discrimination, these provisions of the Act also engage in subject-matter, content-based discrimination. Here, the Act "singles out specific subject matter for differential treatment" because it burdens speech based on whether it "takes into account" an "environmental, social, political, or ideological interest," even if those issues have an indirect connection to financial risk or return. S.B. 183 §§ 1(7), 2(1)(a). Speech that takes into account these factors is regulated; speech that does not is unburdened. *See id.* § 1(7). Thus, Section 2(2) turns on the "message [Glass Lewis] conveys" to its clients and was "adopted by the government because of disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 163-64.

While Glass Lewis does not agree with the characterization of its speech as reflecting political or ideological interest, that is what the Act targets, and First Amendment protections against content-discrimination are at their greatest where, as here, the law targets political speech. The Supreme Court has unanimously held that the government cannot single out "political" and "ideological" messages for differential treatment. *Reed*, 576 U.S. at 156, 159-61, 169 (government regulation singling out "political" and "ideological" speech is "a paradigmatic example of content-based discrimination"). The Act draws the same forbidden line as the law in *Reed* by targeting advice that considers a "political[] or ideological interest." S.B. 183 §§ 1(7), 2(1)(a), 2(2).

### 3. The Act discriminates against the view that different recommendations are appropriate for different clients with different strategies.

On its face, the Act discriminates against the view that differing recommendations are appropriate for different clients with different strategies. If Glass Lewis makes different recommendations to different clients on the same issue—which occurs regularly and appropriately—the Act imposes compelled speech or massive financial penalties; if the recommendations are the same, the Act imposes no burdens. *Id.* §§ 1(6)(a)-(b), 2(3), 3. Section 2(3) applies when Glass Lewis expresses the views that "based on client A's situation, strategies

-13-

and preferences, we recommend client A vote 'FOR' this proposal" but "based on client B's situation, strategies and preferences, we recommend client B vote 'AGAINST' this proposal." When this occurs, the Act forces Glass Lewis to tell its clients, the company at issue, and the Attorney General that it has given "materially different advice" and somehow pick one recommendation and state it is "[p]rovided solely in the interest of shareholders"—even though Glass Lewis believes there is not an objectively "correct" answer. *Id.* § 2(3)(b); Wieck Dec. ¶ 14. Thus, the law discriminates against expressing the view that what might be good for one client might not be good for another client; but uniform recommendations incur no burden.

In addition to the facial viewpoint bias, the purpose of the Act was to burden expression of differing views to differing clients. As the Act's sponsor explained: "it's aimed at preventing inconsistent guidance where a proxy advisor provides materially different advice to different clients on the same proposal without transparency, without accountability." Ex. 11 at 5:10-14. This asserted need for "accountability" reflects his hostility to proxy advisors expressing differing views to different clients. Glass Lewis' perspective is that this is entirely expected and appropriate because clients are differently situated, have different strategies, different time horizons, and different preferences. Wieck Decl. ¶ 11. Thus, the legislative sponsor confirmed that "the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

"That the [Act] might cover a second viewpoint on a second set of facts 'makes [them] more viewpoint based, not less so.'" *Defending Educ.*, 158 F.4th at 756 (quoting *Matal*, 582 U.S. at 249 (Kennedy, J., concurring)). The "Supreme Court's cases reject [a] narrow view of viewpoint discrimination. The Court has instead defined that phrase in a 'broad' way." *Id.*; *see also Matal*, 582 U.S. at 243 (Alito, J., lead opinion).

In addition to viewpoint discrimination, Section 2(3) engages in subject-matter, content-

based discrimination. If the content of Glass Lewis' recommendation is different between clients, its advice is regulated; if the content is the same, the advice is left alone. S.B. 183 § 2(3). Thus, Section 2(3) turns directly on the "message [Glass Lewis] conveys" to its clients and "target[s] speech based on its communicative content." *Reed*, 576 U.S. at 163.

*    *    *

In all its triggering provisions, the Act discriminates both on content and viewpoint. At minimum, these require strict scrutiny. The Attorney General will never meet his burden to show that the Act satisfies that unforgiving standard.

### B.    The Act impermissibly compels Glass Lewis' speech.

Beyond its discriminatory trigger, the Act independently violates the First Amendment because it compels speech. "[N]o government may affect a speaker's own message by forcing [it] to accommodate views [it] does not hold." *303 Creative LLC v. Elenis*, 600 U.S. 570, 599 (2023) (quotation marks omitted). In "case after case, the [Supreme] Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *Moody*, 603 U.S. at 733. "However imperfect the private marketplace of ideas, here was a worse proposal—the government itself deciding when speech was imbalanced, and then coercing speakers to provide more of some views or less of others." *Id.* "[R]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

The Act compels Glass Lewis to speak as Kentucky demands or face sanctions for expressing disfavored views. Whenever Glass Lewis' advice is deemed "not solely in the interest of shareholders" because it considers a "nonpecuniary interest" or disagrees with management, the

-15-

Act forces Glass Lewis to deliver government-mandated statements. S.B. 183 § 2(1)-(2). Glass Lewis must conspicuously state that its own advice "subordinates the financial interests of shareholders to other objectives" and "is not being provided solely in the interest of shareholders." *Id.* § 2(2)(a)-(b). Glass Lewis must "immediately" provide that self-denunciation to the company being discussed, which is often not Glass Lewis' client. *Id.* And if Glass Lewis provides different advice to different clients, the Act requires that same script as well as a separate statement to clients, the subject company, *and the Attorney General. Id.* § 2(3). Glass Lewis must somehow pick which recommendation is "[p]rovided solely in the interest of shareholders," according to Kentucky's own chosen criteria for what constitutes the shareholder's interest. *Id.* § 2(3)(b).

Glass Lewis disagrees with those messages. Wieck Decl. ¶¶ 19-20. Absent S.B. 183, Glass Lewis would not tell its own clients that its advice subordinates their financial interests or pick a single course of action as "solely in the interest of shareholders." *Id.* ¶ 19. Like the unconstitutional law in *303 Creative*, the Act puts Glass Lewis "to a similar choice: If [it] wishes to speak, [it] must either speak as the State demands or face sanctions for expressing [its] own beliefs." 600 U.S. at 589. That is "more than enough[] to represent an impermissible abridgment of the First Amendment's right to speak freely." *Id.*

C.    **The Act is either *per se* unconstitutional or fails strict scrutiny, the minimum standard that applies.**

A "viewpoint-discrimination finding suffices—without more—to hold a government action unconstitutional." *Defending Educ.*, 158 F.4th at 756. In any event, viewpoint discrimination always requires at least strict scrutiny—even for commercial speech or categorically unprotected speech. *See Chiles*, 146 S. Ct. at 1021, 1024; *Catholic Charities of Jackson, Lenawee, & Hillsdale Cntys. v. Whitmer*, 162 F.4th 686, 695-96 (6th Cir. 2025). "The First Amendment requires heightened scrutiny *whenever* the government creates a regulation of

-16-

speech because of disagreement with the message it conveys. . . . Commercial speech is no exception." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (emphasis added).

Likewise, content-based laws require strict scrutiny. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *accord Chiles*, 146 S. Ct. at 1021 ("As a general rule, such 'content-based' restrictions trigger 'strict scrutiny.'"). Even "regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 703 (6th Cir. 2020).

Like viewpoint discrimination, generally compelled speech is *per se* unconstitutional or at least requires strict scrutiny. *See 303 Creative*, 600 U.S. at 596. The government's forcing a speaker to "either speak as the State demands or face sanctions for expressing [its] own beliefs" is "more than enough[] to represent an impermissible abridgment of the First Amendment's right to speak freely." *Id.* at 589.

In any event, outside of limited exceptions, the law's compelling speech makes it content-based, requiring at least strict scrutiny. The Act "is a content-based regulation of speech. By compelling individuals to speak a particular message, [the Act's required statements] alter the content of their speech." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (cleaned up). "[G]overnment-compelled speech inherently regulates speech on the basis of its content." *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 875-76 (5th Cir. 2024).

Under strict scrutiny, the Attorney General bears the burden of demonstrating that the Act is "the least restrictive means of achieving a compelling state interest." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (quotation marks omitted). Strict scrutiny must be "fatal in fact

absent truly extraordinary circumstances." *Id.* at 485. Such extraordinary circumstances do not exist here, and the Attorney General will not be able to meet his burden.

### D.      No lesser standard of scrutiny applies.

Limited exceptions exist; and none apply here. The Act is a "far cry from" a permitted "incidental burden on speech," such as a "logistical notice." *See 303 Creative*, 600 U.S. at 596.

Nor does relaxed scrutiny apply under *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626 (1985). *Zauderer*'s "less searching review" is not blanket permission, but "more deferential review to some laws that require [speakers] to disclose factual, noncontroversial information in *their* 'commercial speech.'" *NIFLA*, 585 U.S. at 768 (emphasis added). *Zauderer*'s relaxed scrutiny applies only when a state compels speakers to disclose (1) "purely factual" and (2) "uncontroversial" information (3) "about the terms under which services will be available" in (4) the speaker's "commercial speech." *Id.* at 768-69 (cleaned up); *303 Creative*, 600 U.S. at 596. The first three criteria focus on the content of compelled statements; the fourth asks if those statements must be inserted into *the speaker's* "commercial speech."

The Supreme Court has repeatedly "emphasized that the [speaker's] statements in *Zauderer* would have been 'fully protected' if they were made in a context other than advertising." *Id.* at 771. To receive *Zauderer* review, a law must "amount to regulation of the product's sale, not of speech." *Catholic Charities*, 162 F.4th at 695.

"But this case involves nothing like that." *303 Creative*, 600 U.S. at 596. Here, Kentucky seeks to force Glass Lewis to "utter what is not in [its] mind" about matters of public concern. *Id.* "And that . . . is something the First Amendment does not tolerate. No government . . . may affect a speaker's message by forcing [it] to accommodate other views; no government may alter the expressive content of [the speaker's] message; and no government may interfere with [the speaker's] desired message." *Id.* (cleaned up).

### 1.    The Act does not regulate commercial speech.

At the outset, "the intermediate-scrutiny standard applicable to commercial speech . . . applies only to a speech regulation that is content-neutral on its face," and the Act engages in viewpoint-based and content-based discrimination. *Int'l Outdoor*, 974 F.3d at 703.

At any rate, the Act does not regulate Glass Lewis' commercial speech. Commercial speech encompasses "[s]peech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quotation marks omitted). Courts "consider whether the speech involves an advertisement, whether it references a product, and whether the motivation for speaking is economic." *Zillow, Inc. v. Miller*, 126 F.4th 445, 460 (6th Cir. 2025). Proxy Papers are not advertisements—they are delivered only to clients that have already engaged Glass Lewis, after the commercial transaction is complete. Wieck Decl. ¶ 30. They are not about any "specific product" Glass Lewis sells, but about how clients should vote on the governance of public companies. *Id.* And Glass Lewis has no economic motivation for the substance of any recommendation—any more than the Wall Street Journal has an economic motivation for a particular editorial—because its compensation does not turn on the substance of its recommendations or whether a proposal passes. *Id.* ¶¶ 30-31; *see Bolger*, 463 U.S. at 67 (economic motivation alone "insufficient").

The Act covers Glass Lewis' speech precisely because it is supposedly "nonpecuniary" and by definition would touch on "environmental, social, political, or ideological interest[s]." S.B. 183 § 1(7). That is not commercial speech; it is "the kind of discussion of 'matters of public concern' that the First Amendment both fully protects and implicitly encourages." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8-9 (1986) (plurality).

### 2.    Other requirements for *Zauderer*'s relaxed scrutiny are not present.

None of the other requirements for *Zauderer* to apply are present. The Act, by definition,

-19-

does not regulate the terms on which Glass Lewis' services are offered or the sale of its products. S.B. 183 applies only when Glass Lewis makes a recommendation, which it does after clients have bought its services. Wieck Decl. ¶ 30. Those recommendations are entirely unrelated to "commercial advertising" and the "terms under which services will be available." *Id.* ¶¶ 30-36. *Zauderer* has no application where, as here, "the content (indeed the viewpoint) of the plaintiffs' speech is what triggers application of" the law. *Catholic Charities*, 162 F.4th at 695.

Here, the Act's compelled statements are neither "purely factual" nor "uncontroversial." Laws should "rarely" meet this "demanding standard[.]" *Chelsey Nelson Photography, LLC v. Louisville-Jefferson Cnty. Metro Gov't*, 624 F. Supp. 3d 761, 789 (W.D. Ky. 2022) (cleaned up).

**Controversial**: A statement is "uncontroversial" only "where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 282 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025).

Here, the compelled statements force Glass Lewis to take a particular position in a live, contentious politicized dispute. The Act is "meant to prevent proxy voting recommendations from being made based on non-financial agendas, for example, social, political, or ideological interests" by forcing Glass Lewis to deem those factors "not solely in the interest of shareholders." Ex. 11 at 4:16-23; S.B. 183 § 2(1). But the relevance of environmental and social factors is subject to intense debate among investors and politicians alike. *Compare, e.g.*, Ex. 28 at 48-49, 55-57 (House Judiciary Committee describing proxy advice as part of "climate cartel"), *with* Ex. 29 at 2 ("Subcommittee Democrats underscored the importance of access to environmental, social, and governance (ESG) data in . . . making prudent investment decisions."). Indeed, Section 2(3) is only triggered when Glass Lewis' clients have different views on a shareholder vote, meaning those

-20-

recommendations are necessarily subject to a "live debate." S.B. 183 § 2(3).

*Not purely factual*: On the "purely factual" prong, S.B. 183's compelled message demands Glass Lewis voice the State's view about whether its advice is "solely in the interest of shareholders." *Id.* § 2(2)(a)(1). The "'factual' nature of a statement turns on the certainty the statement expresses." *RJ Reynolds*, 96 F.4th at 879 n.48. Non-falsifiable "interpretations, reactions, or opinions" are non-factual. *Id.* at 878-79 (cleaned up).

But whether a particular shareholder vote is "solely in the interest of shareholders" is a "judgmental" question on which there is "typically [] not a 'correct' viewpoint." Ex. 26 at 48,278. Different Glass Lewis clients, who have different investment strategies and time horizons, hold sharply different views about what serves their interests. Wieck Decl. ¶ 13. Some have adopted policies skeptical of ESG-related considerations; others treat climate-related risks as material to long-term value; still others adopt faith-based policies reflecting Catholic social teaching. *Id.* What is solely in the interest of one client may not be in the interest of another. *Id.* Glass Lewis' Proxy Papers state that its recommendations are "solely statements of opinion, and not statements of fact, on matters that are, by their nature, judgmental." Ex. 4 at 40; Ex. 5 at 55. Yet the Act forces Glass Lewis to state what serves a client's interest based on Kentucky's own chosen criteria. S.B. 183 § 2(2)(a)(1), 2(3)(b)(1).

### 3.    The Act fails even under *Zauderer*'s relaxed standard.

The Act cannot even satisfy *Zauderer*'s relaxed scrutiny. When *Zauderer*'s relaxed scrutiny applies, a compelled-speech requirement still cannot be "unjustified or unduly burdensome." *NIFLA*, 585 U.S. at 768 (quotations marks omitted). Kentucky "has the burden" to prove the law satisfies this standard, and it cannot do so. *Id.* at 776.

*            *            *

Because the Act discriminates based on viewpoint and content, compels speech, and fails

-21-

every standard from strict scrutiny to *Zauderer*, it violates the First Amendment.

### III.    Likely Success on the Merits: the Act is Unconstitutionally Vague.

The Due Process Clause demands that a statute give regulated parties fair notice of what it requires and constrain enforcement discretion so that the Act is not applied in an arbitrary or discriminatory manner. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 254. With thousands of reports to hundreds of clients, the stakes are high. If Glass Lewis fails to divine when and how to give the compelled statements, the Act allows for steep penalties of $2,000 per violation. Ky. Rev. Stat. § 367.990.

### A.    Persons of ordinary intelligence must guess at the Act's meaning.

A statute is unconstitutionally vague when a person of ordinary intelligence "must necessarily guess at its meaning and differ as to its application." *Fox*, 567 U.S. at 253. S.B. 183 fails that test.

***Triggering provisions.*** Section 2(2) requires proxy advisors to make statements when a proxy advisory service is "wholly or partly based on, or otherwise takes into account, one (1) or more nonpecuniary interests or subordinates the financial interests of shareholders to other objectives, including sacrificing investment returns or undertaking additional investment risk to promote or further nonpecuniary interests." S.B. 183 §§ 2(1)(a), 2(2). But the Act defines "nonpecuniary interest" with reference to a few non-exclusive examples: "'Nonpecuniary interest' includes *but is not limited to* an environmental, social, political, or ideological interest which does not have a direct and material connection to the financial risk or financial return of an investment." *Id.* § 1(7) (emphasis added).

There is no way for Glass Lewis to determine what interests besides those listed qualify as "nonpecuniary interests." At least one court has held the analogous term "nonfinancial"

-22-

unconstitutionally vague. *SIFMA v. Ashcroft*, 745 F. Supp. 3d 783, 800-01 (W.D. Mo. 2024). And there is no agreed, reliable way in the industry to determine whether any given factor has a "direct" "connection to the financial risk or financial return of an investment." Wieck Decl. ¶ 38. "Direct" is undefined. *See Texas v. Yellen*, 105 F.4th 755, 772 (5th Cir. 2024) (noting "the capacious meaning of the term 'indirectly'"). Does the nomination of a director have a "direct" or "indirect" impact on a company's finances? What about concerns with supply-chain practices? Board independence? The answer is left entirely to the discretion of the Attorney General.

Nor does the definition of "material connection" help. Such a connection exists whenever a "reasonable investor would consider it important," but the Act never defines a "reasonable investor." S.B. 183 § 1(5). The Sixth Circuit has held that a law that turns on "reasonableness" but "fail[s] to include a definition of 'reasonable'" is unconstitutionally vague. *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 558-59 (6th Cir. 1999). That is unsurprising: what is "reasonable" "will substantially vary from individual to individual." *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 (6th Cir. 1998) (law is vague where "it is not susceptible to objective definition"); Wieck Decl. ¶ 39. A shareholder vote is "by its nature judgmental" and "there typically is not a 'correct' viewpoint," meaning that "reasonable investors" will likely take both sides. *See* Ex. 26 at 48,278.

***Compliance obligations.*** The compliance obligations are no clearer. The Act never says what satisfies "particularity," whether all differing recommendations can be "[p]rovided solely in the interest of shareholders," or what to do if an advisory service does not "concern" "a recommendation." S.B. 183 §§ 2(2), 2(3)(b)(1). Glass Lewis is left to "guess" at the answers to these fundamental questions. *See Fox*, 567 U.S. at 253.

**B.      The Act invites arbitrary and discriminatory enforcement.**

S.B. 183 is also vague because it fails to "establish minimal guidelines to govern law

enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999). "Where inherently vague statutory language permits . . . selective law enforcement, there is a denial of due process." *Smith v. Goguen*, 415 U.S. 566, 576 (1974). S.B. 183 invites exactly that.

*First*, the Attorney General has standardless discretion over the operative provisions identified above. He decides whether a recommendation has only a "direct" or "indirect" impact on financial risk; whether a "reasonable investor" would agree; and whether advice is deemed "nonpecuniary" or "ideological" or "social." S.B. 183 § 1(5), (7), 2(2), 2(3)(b)(1). Each of those judgments turns on terminology "not susceptible to objective definition[.]" *United Food*, 163 F.3d at 360. The Act grants him the power to regulate speech "that offends [his] subjective beliefs and values under the guise that [it violates the law]. It is precisely this danger of arbitrary and discriminatory application that violates the basic principles of due process." *Id.* at 361.

*Second*, the Attorney General and his office have made their "personal predilections" against Glass Lewis' speech unmistakable. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). The Attorney General frequently touts his litigating against (what he perceives) as a "radical green agenda" and the "attempt to influence investments based on climate change theories instead of returns." Exs. 32-34. His office demanded that Glass Lewis "cease" providing advice reflecting "climate and diversity, equity, and inclusion priorities." Ex. 17 at 1. A law this vague, in hands this committed, "furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (quotation marks omitted). The same vague provisions that leave Glass Lewis guessing also let the Attorney General find a violation when he chooses and overlook one when he does not.

IV.     **The Remaining Preliminary Injunction Factors Favor Glass Lewis.**

      A.     **Glass Lewis will suffer irreparable harm.**

Glass Lewis will suffer irreparable harm absent an injunction because it will be forced to publish Kentucky's viewpoints as if they were Glass Lewis' own. Wieck Decl. ¶¶ 27-29. This "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Defending Educ.*, 158 F.4th at 760-61 (compelled speech is an irreparable injury).

Glass Lewis will also suffer irreparable reputational harm: the compelled message that its advice "subordinates" clients' financial interests strikes at the relationship with the clients who hire it precisely to further those interests. Wieck Decl. ¶¶ 28-29. "[R]eputational loss, of course, can constitute irreparable harm." *Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, 2023 WL 6601863, at *2 (6th Cir. 2023). Compliance costs will total hundreds of thousands of dollars at minimum, and they may not be recovered as damages because of sovereign immunity. Wieck Decl. ¶¶ 24-26; *see Biden*, 57 F.4th at 555-56 (unrecoverable compliance costs are irreparable harm).

**B.        The balance of equities and the public interest favor an injunction.**

The final factors "merge when the government is the defendant." *Biden*, 57 F.4th at 556. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (quotation marks omitted). And the Attorney General is not injured by an order enjoining him from enforcing an unconstitutional law—especially here, where the Act is not solving any actual problem. The Legislature never identified any Kentucky investor ever misled by proxy advice. It just disfavored the views in that speech. The balance of the equities and the public interest favor an injunction.

### CONCLUSION

Glass Lewis respectfully requests a preliminary injunction prohibiting the Attorney General—and his officers, agents, employees, attorneys, and all other persons who are in active concert or participation with him—from taking any action to enforce S.B. 183 against Glass Lewis.

Dated: June 18, 2026

Respectfully submitted,

**YETTER COLEMAN LLP**

*/s/ Bryce L. Callahan*

Bryce L. Callahan*
bcallahan@yettercoleman.com
Grant B. Martinez*
gmartinez@yettercoleman.com
Lily E. Hann*
lhann@yettercoleman.com
Austin T. Brumbaugh*
abrumbaugh@yettercoleman.com
Jared LeBrun*
jlebrun@yettercoleman.com
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000
(713) 623-8002 (fax)

* Admitted *pro hac vice*

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*